177 A.3d 755

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. TORMU
E. PRALL, A/K/A JUDDS EMMANUEL, BUTLER JAMES AND
PRALL MANUEL, DEFENDANT-RESPONDENT.

A–28 September Term 2016
078169

Argued October 23, 2017—Decided January 31, 2018

568

Jennifer E. Kmieciak, Deputy Attorney General, argued the cause for appellant (Christopher S. Porrino, Attorney General, attorney; Jennifer E. Kmieciak, of counsel and on the briefs).

Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, of counsel and on the briefs).

JUSTICE SOLOMON delivered the opinion of the Court.

Defendant Tormu Prall was charged with and convicted of the arson murder of his brother, John Prall (John), and the attempted murder of John's girlfriend, Kimberly Meadows (Kimberly).

The Appellate Division reversed defendant's conviction finding that: his prior threat to kill his girlfriend, Jessie Harley (Jessie), was admitted in error and without a limiting instruction; the State improperly utilized prior bad act evidence in closing; and statements by John to Kimberly were inadmissible hearsay and did not qualify as dying declarations or excited utterances.

We granted the State's petition for certification and now reverse the judgment of the Appellate Division and reinstate defendant's convictions. We agree with the appellate panel's legal conclusions that the trial court erred by allowing evidence that defendant

threatened to burn down Jessie's homes and by admitting John's hearsay statements to Kimberly that defendant was responsible for the arson. However, we find the errors were not capable of producing an unjust result because of the overwhelming weight and quality of the evidence against defendant.

## I.

We rely upon the trial transcript and the appellate record for the following facts and procedural history.

## A.

John moved into his late mother's house in Trenton (the Trenton home), where defendant also lived and where defendant's girlfriend, Jessie, stayed four to five times per week. At that time, the utilities were turned off at the Trenton home for nonpayment; they were restored when John satisfied the outstanding utility bills.

About two weeks after John moved in with defendant and one week before the fire, John and defendant argued about defendant's failure to contribute to the bills and engaged in a physical altercation.[1] The Friday before the fire, John prevented Jessie and defendant from entering the Trenton home, and defendant and John argued again about the bills. Jessie persuaded defendant to leave with her and stay at her house that night.

The following morning, Jessie drove defendant back to the Trenton home. Kimberly was there visiting John. Kimberly testified that she heard the two argue again about the bills, and heard defendant tell John, "you food, you food," before a physical altercation[2] broke out between the brothers.[3] During the argu-

---

[1] Jessie testified at trial that John "grabbed him and they began to tussle" and "they was fighting a little bit."

[2] Kimberly testified that she was downstairs when the altercation began, but stated she heard "a lot of scuffling like bumping around and stuff like that."

ment, Jessie was waiting in the car in front of the Trenton home. She testified that as defendant exited the home he yelled to John, "you're going to die, you're going to die, you're going to die." Jessie then took defendant back to her house.

That night, at around 7:30 p.m., defendant asked Jessie to return him to the Trenton home. Jessie did so and, while waiting in the car, heard yelling from inside. Defendant then returned to the car "with a gas can in his hand" and said, "I'm going to set the mo**erfu**er on fire. Would you take me to the gas station so I can get some gas?" Jessie declined and, while driving defendant to her house, defendant yelled, "f**k him, I'm going to kill him." At Jessie's house, defendant continued to talk about John, stating that "Cain killed Abel and [I'm] going to kill [my] brother."

Two days later, in the morning, defendant was at Jessie's house when she left for work as a school bus driver; defendant was not there when Jessie completed her route and returned home. Jessie testified that defendant returned to her house around one o'clock in the afternoon and told her that he had just come from town, where he had argued again with his brother and, in front of many people, said he was going to kill him.

That incident was corroborated by Kimberly, who testified that John had taken her to a bank in downtown Trenton that morning and "h[ad] words" there with his brother. Kimberly heard defendant tell John, "you's a dead man, you dead, you food, you food" and "you are going to die tonight." As John and Kimberly walked away, defendant followed, still trying to argue and calling John a "dead man."

Later that same day, Jessie took defendant into town again and returned to work to complete her afternoon bus route. After completing her afternoon route, Jessie located defendant in North Trenton. When she found him, defendant was "still kind of upset." Shortly after returning to Jessie's house, defendant fell asleep.

---

[3] According to Kimberly's testimony at trial, "food" means "dead" in street slang.

Jessie then left to pick up her children from a movie and took them to another house she owned, where she stayed that evening. When Jessie left defendant, he was wearing a yellow T-shirt.

Kimberly testified that she and John fell asleep that night. An unknown amount of time went by before she "started feeling something ... hot on [her] right side." Laying on her side she asked John, "[W]hy do you feel so hot?" She then rolled over to find John on fire from his waist up. Kimberly noticed that her own legs were also on fire. When Kimberly awakened John, he began "hollering and screaming saying oh, my God. My brother, my brother." Kimberly and John were able to exit the Trenton home. An ambulance arrived shortly thereafter and transported them to a hospital. Both were later transferred to the burn unit at Temple University Hospital. John died four days later.

## B.

The investigation of the fire by the Trenton Police Department and Mercer County Prosecutor's Office revealed the following evidence, which was admitted at trial.

During the search of the Trenton home, a trained dog alerted officers to the presence of ignitable liquids in the second-floor front bedroom, where John and Kimberly had been sleeping. A red gas can, a BIC lighter, matches, and a can of WD–40 oil were located in the second-floor rear bedroom. At trial, Jessie identified the red gas can as the one defendant had retrieved from the Trenton home two days before the fatal fire. A qualified expert in K–9 handling, fire investigation, and accelerant detection testified at trial that the fire was incendiary, intentionally set, and fueled by an accelerant. He further determined that the fire had two points of origin: the second-floor doorway leading into the front bedroom and the mattress in the same bedroom.

Paul Bethea, a City of Trenton sanitation worker, testified that he personally witnessed the argument between John and defendant in front of the downtown bank on the Saturday before the fire. Bethea also testified that, on the morning of the fire, he drove

by the scene on his way to work and saw defendant standing on a nearby corner "staring at the fire." Bethea stated that he then went into the work-yard to prepare his truck for the day, which took approximately twenty minutes; after he left the work-yard, defendant was still "staring at the fire."

Based on the information gathered during the investigation, detectives filed charges against defendant and issued a warrant for his arrest. Almost a year later, defendant was located in Connecticut. After returning defendant to New Jersey, a detective noticed and photographed "severe burns to [defendant's] hands." Detectives also learned from Jessie and others that approximately one month before the fire, defendant threatened to burn down both of Jessie's houses when she attempted to end their relationship. As a result, Jessie obtained a restraining order against defendant. Jessie also admitted the following: after the fire, she found the yellow T-shirt defendant wore on the night of the fire; the T-shirt had dried blood and skin on it; and she discarded the T-shirt out of fear of defendant.

An indictment was returned by a Mercer County grand jury charging defendant with first-degree felony murder, N.J.S.A. 2C:11–3(a)(3) (count one); first-degree murder, N.J.S.A. 2C:11–3(a)(2) (count two); second-degree aggravated arson, N.J.S.A. 2C:17–1(a)(1) (count three); and first-degree attempted murder, N.J.S.A. 2C:11–3 and N.J.S.A. 2C:5–1 (count four).

Before trial, the State sought a preliminary determination of the admissibility of Jessie's testimony that defendant threatened to burn down her houses. In response, the court scheduled a Cofield [4] hearing pursuant to N.J.R.E. 404(b) to address the admissibility of that evidence of prior bad acts. After the hearing, the court determined that the evidence was inadmissible because the "apparent prejudice" outweighed any probative value. The court concluded that "[t]his is exactly the type of [propensity] evidence that N.J.R.E. 404(b) seeks to exclude."

---

[4] State v. Cofield, 127 N.J. 328, 338, 605 A.2d 230 (1992).

## C.

### 1.

At trial, during direct examination by the State, Jessie testified that, two days after the fire, she found the yellow T-shirt defendant wore the night of the fire with "dry blood and skin on it." She further testified that she "threw it in the trash" because officers had not found defendant and "[she] was scared." Defense counsel objected to Jessie's further testimony regarding her fear of defendant, but the court allowed it, instructing the prosecutor to ask "[l]eading questions . . . so we don't get too far off the chart." The prosecutor asked Jessie, "and specifically he threatened to kill you," drawing another objection. The court sustained the objection and instructed the jury to disregard the question.

On cross-examination, defense counsel questioned Jessie's delay in reporting the yellow, blood-stained T-shirt she had found, and challenged whether she was truly afraid of defendant:

Q: Have you reported—you ever reported to anyone that you were scared of Mr. Prall?

A: Just when we was in a relationship, yes. When he threatened me, I reported it to the police, yes.

Q: But you never filed charges in that case, correct?

A: No.

Q: You filed a restraining order?

A: Yes, just a restraining order.

Q: That you later dismissed, right?

A: Yes.

Q: But for that one instance, you never reported to anyone that you were scared of him, correct?

A: No, I haven't.

At the conclusion of Jessie's cross-examination, the prosecutor argued at sidebar that he should be permitted to question Jessie on re-direct examination regarding the specific threats defendant made to her because defense counsel "opened the door." Finding a distinction between direct evidence and rebuttal evidence, the court ruled that the prosecutor could explore the nature of the

threats. On re-direct examination, the prosecutor questioned Jessie about defendant's threats to kill Jessie:

Q: He threatened to kill you over the next few days, did he not?

A: Yes, he did.

Q: He threatened to burn your house down, both houses in Burlington and the one in Trenton; did he not?

A: Yes, he did.

Q: He told you all I need is a gallon of gas to do it? Didn't he tell you that?

A: Yes.

Q: And didn't he also call your employer and told your supervisor he was going to kidnap you and your school bus and then kill you?

A: Yes.

On re-cross-examination, Jessie testified that she did not report to law enforcement that she found and discarded the yellow T-shirt because she was afraid of defendant.

During the State's summation, the prosecutor repeated defendant's threats against Jessie:

Jessie says promise me—talking to the defendant—you won't do anything to your brother. Defendant says, "I can't promise you that." Why did Jessie ask him that? Well, there's only one explanation. Jessie must have really thought he was going to do it because why would she ask him to promise me you won't kill your brother? Why would she say that if she didn't think—and she was there with him—that he was going to kill his brother? Now, think about what she's thinking in her mind. He's already—defendant's already threatened to kill Jessie a month earlier. He tells her a month earlier I'm going to—not just anything, not going to kill you. But what does he use? What does he say? I'm going to set your house on fire, your house in Burlington and your house here. That's how he thinks. That's how he gets revenge on people. That's how he does it. He sets houses on fire. And all I need is a gallon of gasoline.

[ (emphasis added).]

Those statements did not elicit an objection from defense counsel.

2.

During the trial, Kimberly testified—without objection—that when John awoke in flames he shouted repeatedly, "my brother, my brother" as he attempted to extinguish the fire and flee from the Trenton home. During a break, the court expressed concern that those statements were impermissible hearsay. The prosecutor argued that two hearsay exceptions applied—excited utterance

under N.J.R.E. 803(c)(2), and dying declaration under N.J.R.E. 804(b)(2). Defense counsel did not respond, and the court reserved its ruling until after both parties had the opportunity to research the issue.

Ultimately, the court found that it was error to admit the testimony but concluded that an appropriate instruction would cure the error. The curative instruction was given to the jury twelve days later, immediately before summations and after the defense presented its only witness, Dr. Mark Taff, a forensic pathologist who disputed the origin of scars on defendant's hands. The court instructed the jury to disregard Kimberly's testimony about John's references to defendant and said the following:

> The reason I am instructing you to disregard the testimony is that it is hearsay. I wrestled with that and did research and so forth. I heard it as did you, but it has no probative value in this case, and it has the potential really to incite, to inflame, things of that nature, and it should not be used.
>
> . . . .
>
> One has to, therefore, evaluate what is the basis for the statement, and there are many exceptions in the law. Excited utterance, somebody sees something happening and screams. I see a face in the window and it's so and so. And it may have happened under extreme circumstances. In this case if John Prall had said, "My brother's at the window" or something like that or John Jones is at the window, that might be acceptable under certain rules, but that's not the case . . . .

Before charging the jury, the trial judge placed on the record a request from defense counsel that he specifically not "mention again in the charge to the jury to disregard the testimony of [Kimberly] concerning the alleged statements by John Prall." No other jury instructions regarding defendant's threats to Jessie or John's "my brother, my brother" statements were requested or given.

### 3.

The jury returned a guilty verdict on all counts, and the court sentenced defendant to an aggregate term of life plus twenty years in prison—life for John's murder, plus twenty years for defendant's attempted murder of Kimberly—with an eighty-five

percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43–7.2. Defendant appealed.

The Appellate Division reversed defendant's convictions, concluding that evidence of "the dangerously prejudicial fact that defendant had threatened to use the same means for [Jessie's] demise a month earlier" should not have been admitted. The panel also noted that the State's improper use of the evidence in summation compounded the trial court's failure to promptly instruct the jurors on how to use the information.

The appellate panel also found, relying on N.J.R.E. 701, that John's cries blaming defendant for the fire should have been excluded because John would not have been competent to testify to an opinion not rationally based on his perception. Therefore, Kimberly was not permitted to do so, either.

The State petitioned for certification, which this Court granted. 228 N.J. 501, 158 A.3d 585 (2017).

## II.

### A.

First, the State argues that the trial court "properly exercised its discretion in concluding that defense counsel's cross examination of ... Jessie ... opened the door for the prosecution to elicit testimony regarding defendant's specific threats to kill her." According to the State, the threats against Jessie were of special significance because she believed defendant had carried out the same threats against John.

The State also claims that the victim's statements "my brother, my brother," as testified to by Kimberly, were admissible dying declarations or excited utterances.

Finally, the State contends that, even if the challenged testimony was admitted in error, it was not reversible error because "the jury's verdict is amply supported by overwhelming evidence in the record."

B.

Defendant asserts that the prosecutor used evidence of prior bad acts to show propensity, which is "exactly the type of evidence that N.J.R.E. 404(b) seeks to exclude." Defendant concedes that defense counsel went too far in cross-examining Jessie on her fear of defendant, but claims that counsel's transgression opened the door for re-direct examination only on the purported death threat, not on its precise nature.

Defendant agrees with the Appellate Division that John's hearsay statements—"my brother, my brother"—constituted improper lay-witness testimony under N.J.R.E. 701 and claims the court compounded this error by its delay in issuing a curative instruction. Defendant also avers that, even if the instruction was timely, it was tainted by the court's acknowledgment to the jury that the question of admissibility was one that the court had "wrestled with."

III.

This appeal requires our review of the trial court's evidentiary rulings regarding prior bad acts and hearsay. The trial court's evidentiary rulings "are reviewed under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383–84, 997 A.2d 954 (2010). As the appellate panel recognized here, we do not set such rulings aside unless it appears that "there has been a clear error of judgment." State v. J.A.C., 210 N.J. 281, 295, 44 A.3d 1085 (2012) (quoting State v. Brown, 170 N.J. 138, 147, 784 A.2d 1244 (2001)). Said differently, we must be convinced that "the trial court's ruling is so wide of the mark that a manifest denial of justice resulted." Ibid. (quoting Brown, 170 N.J. at 147, 784 A.2d 1244 (internal quotation marks omitted)).

■ Our review of the evidentiary determinations cannot end our analysis when we find an abuse of discretion; rather, we must then determine whether any error found is harmless or requires reversal. The State offered evidence of prior bad acts on a number of occasions—by pretrial motion, during Jessie's direct and redirect examination, and in summation. On some occasions the evidence elicited an objection; on others it did not. Issues regarding the repetition of John's hearsay statements "my brother, my brother" were raised sua sponte by the trial judge. Under those circumstances, we will disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2; see also State v. Macon, 57 N.J. 325, 337–38, 273 A.2d 1 (1971). Accordingly, we must determine whether either claimed "error [was] 'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.' " State v. Daniels, 182 N.J. 80, 95, 861 A.2d 808 (2004) (second alteration in original) (quoting Macon, 57 N.J. at 336, 273 A.2d 1).

To apply those principles, we review both disputed evidentiary rulings and then consider their potential impact on defendant's convictions.

## IV.

### A.

■ We first consider the determination that prior bad acts evidence was admissible here because defense counsel challenged Jessie's purported fear of defendant. We review the admissibility of defendant's threats in the context of N.J.R.E. 404(b), which excludes "evidence of other crimes, wrongs or acts . . . to prove the disposition of a person in order to show that such person acted in conformity therewith."

■ Because of the "underlying danger" that a "jury may convict the defendant because he is a 'bad' person in general," State v. Skinner, 218 N.J. 496, 514, 95 A.3d 236 (2014) (quoting

State v. Cofield, 127 N.J. 328, 336, 605 A.2d 230 (1992)), "to be admissible, such evidence must be 'relevant to a material issue,' and its probative value 'must not be outweighed by its apparent prejudice,'" State v. Sanchez–Medina, 231 N.J. 452, 463, 176 A.3d 788, 2018 WL 475170, at *8 (2018) (quoting Cofield, 127 N.J. at 338, 605 A.2d 230 (factors one and four of multi-factor test)).[5] The mere bolstering of a witness's credibility does not satisfy the relevancy element of the Cofield test. Skinner, 218 N.J. at 520, 95 A.3d 236; State v. Darby, 174 N.J. 509, 520–21, 809 A.2d 138 (2002). Also, if the evidence withstands a Cofield analysis, before its admission the trial "court must instruct the jury on the limited use of the evidence" and "explain precisely the permitted and prohibited purposes of the evidence." Cofield, 127 N.J. at 341, 605 A.2d 230.

After a Cofield hearing, the trial court here determined that evidence about defendant's threats against Jessie was inadmissible because the "apparent prejudice" outweighed any probative value. The court concluded that "[t]his is exactly the type of [propensity] evidence that N.J.R.E. 404(b) seeks to exclude." Later, however, the judge found that defense counsel "opened the door" to evidence of defendant's threats to burn down Jessie's houses.

The "opening the door" doctrine is "a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection." State v. James, 144 N.J. 538, 554, 677 A.2d 734 (1996) (emphases omitted). In other words, it permits "a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use

---

[5] There is no dispute that the second element of the Cofield analysis, requiring that the prior act be "similar in kind and reasonably close in time to the offense charged," Cofield, 127 N.J. at 338, 605 A.2d 230, is satisfied. Likewise, the clear-and-convincing element of the Cofield test is not in dispute because the testimony concerning the threat came directly from the victim of the threat, whom the trial judge found to be credible.

of related evidence." Ibid. (citation omitted). The "doctrine operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context." Ibid. The doctrine is limited, however, by weighing the probative value against the prejudicial nature of the evidence under N.J.R.E. 403. Ibid.

To the extent that evidence of the threats was intended to bolster Jessie's credibility as a witness, we emphasize that such use of prior bad acts evidence does not satisfy the relevancy element of the Cofield test. Skinner, 218 N.J. at 520, 95 A.3d 236. Furthermore, even if defense counsel did "open the door" to testimony about defendant's threat, rendering it relevant, the probative value of that testimony would nevertheless need to outweigh its apparent prejudice to be admissible. See James, 144 N.J. at 554, 677 A.2d 734 (subjecting "opening the door" argument to probative/prejudice balancing test).

Here, defense counsel challenged Jessie's representation that she feared defendant, which did—as defendant concedes—render potential rebuttal evidence relevant. On re-direct examination, however, the prosecution did not limit itself to the subject of Jessie's fear. Rather, the prosecutor impermissibly expanded that subject by eliciting testimony about the specific nature of defendant's threat and its similarity to what occurred in this case. The prosecutor then fatally undermined any claim by the State that it was seeking merely to rebut defense counsel's cross-examination by improperly arguing propensity in closing:

> But what does he use? What does he say? I'm going to set your house on fire, your house in Burlington and your house here. That's how he thinks. That's how he gets revenge on people. That's how he does it. He sets houses on fire. And all I need is a gallon of gasoline.
>
> [ (emphases added).]

Defendant correctly argues that the State could have directed the jury's attention to defendant's death threats without relaying the specific nature of the threats; such testimony would be admis-

sible to rebut any implication that Jessie and defendant "were involved in minor domestic squabbles" only and that she was overstating her fear of him. The specific nature of the threats, however, is highly prejudicial propensity evidence without justifying relevance, which N.J.R.E. 404(b) explicitly prohibits. See, e.g., State v. P.S., 202 N.J. 232, 260, 997 A.2d 163 (2010) (holding evidence of unrelated sex crime tending to show propensity inadmissible because "unmoored from the principles informing N.J.R.E. 404(b)"). Essentially, even if defense counsel "opened the door," counsel did not open it so wide as to allow in inadmissible evidence of prior bad acts.

We hold, therefore, that it was a "clear error of judgment" and an abuse of discretion for the trial court to permit Jessie's testimony on redirect examination that defendant threatened to kill her by burning down her houses. That evidence was not "relevant to a material issue," and its probative value was "outweighed by its apparent prejudice." Sanchez–Medina, 231 N.J. at 465, 176 A.3d at 795, 2018 WL 475170, at *8 (quoting Cofield, 127 N.J. at 338, 605 A.2d 230). The error was magnified by the trial court's failure to "instruct the jury on the limited use of the evidence" before its admission. Cofield, 127 N.J. at 341, 605 A.2d 230.

### B.

We next consider whether the admission of Kimberly's hearsay testimony that, after waking up engulfed in flames, John hollered "my brother, my brother," was also error and, if so, whether the error was remedied by the court's curative instruction. In deciding the admissibility of the hearsay statements, we must review the applicable exceptions to the rule against hearsay.

### 1.

To begin, N.J.R.E. 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." Hearsay is generally inadmissible "except as provided by [the Rules of Evidence] or by other law." N.J.R.E. 802. In the present appeal, the State relies on two exceptions to the hearsay rule to support admissibility—the excited-utterance exception and the dying-declaration exception.

N.J.R.E. 803(c)(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate." A dying declaration, which is a "[s]tatement under belief of imminent death," is also "admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." N.J.R.E. 804(b)(2). Although there is no controlling New Jersey authority explaining "belief of imminent death," the United States Supreme Court has held that "[d]espair of recovery may indeed be gathered from the circumstances if the facts support the inference." Shepard v. United States, 290 U.S. 96, 100, 54 S.Ct. 22, 78 L.Ed. 196 (1933).

▮▮▮ The State contends that John's statements to Kimberly— "my brother, my brother"—made while John was engulfed in flames, are excited utterances and dying declarations. Nevertheless, they are not allowable as hearsay exceptions unless they would be admissible if testified to at trial by the declarant. 6 McCormick on Evidence § 18 (2006); see also N.J.R.E. 701; McCormick at § 272, 313. An excited utterance or dying declaration may be excluded if the declarant did not have direct personal knowledge of the statement's basis. Ibid. Thus, to be admissible, John's statements to Kimberly must have been based upon John's "firsthand" observations. Ibid.

The fire started while John and Kimberly were asleep, and John did not awaken until he was engulfed in flames. The record does not contain evidence that John made any observations or had direct knowledge that defendant started the fire. Thus, whether offered as dying declarations or excited utterances, John's statements, "my brother, my brother," were inadmissible hearsay

because they were not based on actual knowledge. The statements should not have been admitted.

2.

■■■■ Although the trial court allowed Kimberly to testify about John's statements blaming his brother for the arson, the court ultimately disallowed the testimony and gave a curative instruction. Therefore, we consider whether the trial court's curative jury instruction sufficiently mitigated any prejudice caused by the admission of the hearsay.

■■■■ When inadmissible evidence is admitted in error by the trial court, a curative instruction may sometimes be a sufficient remedy. See State v. Winter, 96 N.J. 640, 646, 477 A.2d 323 (1984). An effective curative instruction needs to be "firm, clear, and accomplished without delay." State v. Vallejo, 198 N.J. 122, 134, 965 A.2d 1181 (2009); see also State v. Wakefield, 190 N.J. 397, 452, 921 A.2d 954 (2007) (noting trial court issued "immediate curative instruction" to deal with issues raised by State's comments "promptly and effectively"); State v. Papasavvas, 163 N.J. 565, 614, 751 A.2d 40 (2000) (explaining that State expert's testimony regarding defendant's guilt was improper but that "trial court's curative instructions given immediately after [the] statements ... were sufficient to remedy [the] improper testimony"); State v. Harvey, 151 N.J. 117, 203–05, 699 A.2d 596 (1997) (concluding that trial court's curative instruction was sufficient to mitigate prejudice to defendant caused by reference to unindicted suspect's polygraph results where instruction to disregard evidence was immediate); Winter, 96 N.J. at 649, 477 A.2d 323 (holding curative instruction sufficient because, "[b]efore defense counsel even objected, the court struck the offending remark" and, after brief recess, gave "sharp and complete curative instruction"); State v. LaPorte, 62 N.J. 312, 318, 301 A.2d 146 (1973) ("The trial judge immediately instructed the jury in the strongest terms to disregard the offending remark.").

■ Moreover, in curing potentially prejudicial testimony, a judge must not confuse a jury by disclosing the court's own reasons for denying or admitting evidence, which are extraneous and potentially suggestive. Cf. State v. Ridout, 299 N.J. Super. 233, 240–41, 690 A.2d 1066 (App. Div. 1997) (finding reversible error in trial judge's potentially influential statements to jury which "effectively took that issue out of its hands" and collecting cases from other jurisdictions finding that trial courts' references to reasoning behind their evidentiary decisions can be so suggestive as to taint jurors' consideration of admitted evidence).

Here, the curative instruction was given before summations, twelve days after the improper testimony; it was not given immediately. In giving the instruction, the trial judge discussed, among other things, the excited utterance hearsay exception and the fact that he had "wrestled with" the statements' admissibility and barred them after conducting "research and so forth."

Therefore, although the judge properly informed the jury of the specific evidence they were to disregard, he did so neither soon enough nor sufficiently firmly, clearly, and effectively to "remedy [the] improper testimony." See Papasavvas, 163 N.J. at 614, 751 A.2d 40. We thus find an abuse of discretion in the admission of the hearsay evidence and a failure to sufficiently remedy that error via curative instruction.

■ We take this opportunity to remind our trial courts that when delivering curative instructions, judges should limit their comments to the ruling itself and not add commentary that could cause confusion or dilute the instruction's effect. Ridout, 299 N.J. Super. at 240, 690 A.2d 1066.

V.

■ Having found that the trial court abused its discretion through the improper admission of both hearsay and prior bad acts evidence and the failure to properly instruct the jury as to either, we now consider whether those errors were "clearly capa-

ble of producing an unjust result." R. 2:10–2. We repeat that, to warrant reversal of defendant's conviction, those errors, singly or collectively, must "raise a reasonable doubt" as to whether they affected the result reached by the jury. Macon, 57 N.J. at 336, 273 A.2d 1. Also, "[t]he error[s] must be evaluated 'in light of the overall strength of the State's case.'" Sanchez–Medina, 231 N.J. at 468, 176 A.3d at 797, 2018 WL 475170, at *10 (quoting State v. Galicia, 210 N.J. 364, 388, 45 A.3d 310 (2012)).

Here, there was overwhelming fact and expert evidence properly offered against defendant. On numerous occasions and before many witnesses, defendant threatened to kill his brother. On at least one occasion, two days before the fire, defendant told Jessie he would burn his brother to death. Indeed, on that occasion, defendant retrieved a gas can from his home and asked Jessie to take him to fill it. That same gas can was later recovered from the scene of the fire by investigators and identified at trial by Jessie. Investigators determined that the fire originated in the bedroom where John and Kimberly slept. Jessie also provided testimony that she last saw defendant in a yellow T-shirt and then found the same shirt after the arson with dried blood and skin on it. Paul Bethea, the City of Trenton sanitation worker, testified that he witnessed defendant and John arguing in front of a Trenton bank and that he saw defendant at the scene of the fire, standing on the corner "staring at the fire" for a period of at least twenty minutes. Defendant fled the state after the fire. Nearly a year later, detectives located defendant and observed burn scars on his hands.

This is a rare case in which we find significant errors by the trial court to be harmless because, when evaluated in light of the vast evidence against defendant, those errors were not "sufficient to raise a reasonable doubt as to whether [they] led the jury to a result it otherwise might not have reached." Daniels, 182 N.J. at 95, 861 A.2d 808 (quoting Macon, 57 N.J. at 336, 273 A.2d 1); see also State v. Marrero, 148 N.J. 469, 497, 691 A.2d 293 (1997) (finding insufficient instruction as to other crimes evidence harm-

less because, in "consideration of the near overwhelming evidence of guilt," instruction "did not tip the scales"). Here, there was overwhelming admissible evidence on which to convict defendant, and his convictions should therefore not have been disturbed.

## VI.

For the reasons set forth above, we reverse the judgment of the Appellate Division and reinstate defendant's convictions.

CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ–VINA, and TIMPONE join in JUSTICE SOLOMON's opinion.