**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5304-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALAN A. BIENKOWSKI,

     Defendant-Appellant.

Submitted October 17, 2018 – Decided January 25, 2019

Before Judges Alvarez and Nugent.

On appeal from Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 13-09-2265.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Deputy Public Defender, of counsel and on the brief).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel J. Marzarella, Chief Appellate Attorney, of counsel; Roberta DiBiase, Supervising Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Alan Bienkowski was convicted of first-degree murder, N.J.S.A. 2C:11-3(a) (count one); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count two); first-degree robbery, N.J.S.A. 2C:15-1 (count three); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count four); third-degree theft, N.J.S.A. 2C:20-3 (count five); and second-degree armed burglary, N.J.S.A. 2C:18-2A(1) (count six).[1]  The judge merged the counts charging murder and felony murder, and sentenced defendant to thirty-five years imprisonment subject to thirty years without parole pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2 (NERA).  The judge also imposed the following terms, concurrent to the murder conviction and each other:  eighteen years subject to NERA on the first-degree robbery; eight years with three years of parole ineligibility on the unlawful possession of a weapon; four years on the theft by unlawful taking; and seven years subject to NERA on the armed burglary.  We affirm.

The facts are drawn from the record of pretrial motions and the trial proceedings.  Acquaintances discovered the body of seventy-six-year-old Anthony Verdicchio on May 13, 2013, at his trailer home in a mobile park.  He

---

[1]  Count seven charged defendant with fourth-degree criminal trespass, N.J.S.A. 2C:18-3(a), a lesser included to the burglary.  It was merged at sentencing with the burglary.

lay on the floor of a spare bedroom filled with memorabilia and other objects related to his flea market activities. Verdicchio was partially covered by a comforter, and a blood-filled piece of black plastic covered the top of his head. A piece of paper under his right arm had a faint footprint that the State matched to defendant's right sneaker in size, design, and tread pattern. The victim died from numerous blows to the head; the autopsy results indicated the wounds may have been inflicted by a hammer.

Defendant, who also lived in the mobile park, owed the victim money. Police located a witness who saw a man wearing a black baseball cap standing on the victim's front porch on May 11, while at the time, a black pickup truck with a New York Yankees sticker on the back window was parked out front. Defendant drove a black pickup truck with a Yankees sticker on the rear window.

Police interviewed defendant on May 15. He then denied having seen Verdicchio for days prior to his death. He insisted that on Sunday, May 12, he had been at home the entire day except for a morning trip to a dog park.

Defendant later told police that he met a friend that day and had gone to his sister's home. His statement to police changed when confronted with the information that his truck was seen in front of the victim's trailer. He then

admitted he had stopped by to assure the victim that the outstanding loan would be repaid but remained on the porch and denied that his DNA would be found inside the home. He consented to a search of his own trailer.

During the search, police seized a pair of blood-stained sneakers. When asked about the blood stains, defendant claimed they came from his old job working in a butcher shop. The blood on the shoes proved to be Verdicchio's and was admitted into evidence at trial.

When police asked defendant about collectible coins found in his home, he insisted he had obtained them from his mother, and not from the victim, who collected coins. After the second post-search interview ended, and the tape machine turned off, defendant said that he had driven to Newark on Sunday, May 13, to buy heroin because he was a drug addict.

Approximately a week later, defendant's sister Susan Kosker spoke to detectives and told them she had called defendant the morning of May 12. She and defendant planned to visit their mother's grave because it was Mother's Day, however, he never followed up on the conversation.

In mid-June, police interviewed Kosker regarding a drug offense, and she volunteered that her brother had written to her asking that she empty the contents of his storage unit, particularly two guns, because otherwise he would "be

screwed." Defendant had rented the unit on Monday, May 13, the day the victim's body was discovered.

Kosker consented to a search of her home. She turned over to police three plastic bins and a shoe box she had taken from the unit. The bins, which police knew came from the unit and belonged to defendant, contained coins, sports memorabilia, other collectibles, and one handgun.[2] The firearm belonged to the victim, and two of the other items in the bins tested positive for his blood.

Defendant testified at trial. He told the jury that he was a drug addict during the period of time in question. On May 13, the day Verdicchio's body was discovered, he noticed a black garbage bag on the ground near the back of the victim's van as he drove past, and that Verdicchio's front door was ajar. Defendant pulled over and walked around outside the trailer calling the victim's name. He looked into the garbage bag, and into a second bag on the steps, and saw several flea market-type items. When defendant entered the house, he found the victim's body.

Defendant said that although he knew he should have called for assistance, he instead lifted the plastic bag covering Verdicchio's face, saw he was dead, and placed a comforter over his body. He did not realize the victim's blood

_____

[2] The parties stipulated that only one handgun was found.

stained his sneakers. To avoid being charged with murder, he told no one about the body, and decided to sell the items in the bags for cash to support his habit. Defendant placed the stolen items in plastic containers, and placed them in a rented storage unit. He went to Newark that day to buy drugs.

Defendant explained that he lied to police during the interview because he did not want to be blamed for the killing, but insisted he was not lying on the stand because he was no longer a drug addict. He added that he had asked his sister to remove the bins from the storage unit because he was afraid, but denied telling her that she would have to get rid of the handgun, or that he would "be screwed."

Kosker's testimony also contradicted her earlier statements to police; she said they were lies either she or the police manufactured. She did not remember some of her statements at all because she claimed she was ill and under the influence at the time she made them. Kosker insisted she merely told police what she thought they wanted to hear in order to be released from the station. Defendant's other sister testified that in June 2013, when she and defendant spoke on the phone, he told her his car had been at the victim's house on May 12 because he visited him in order to repay the loan.

A-5304-15T2

The State's expert witness on blood patterns testified that the blood stains on defendant's sneakers were made by droplets, not by splashing as defendant claimed happened when he walked through the house. The expert opined that if defendant had stepped in Verdicchio's blood he would have left "contact transfer impressions" from the shoe to the floor as he walked, yet the only bloody imprint police found was the faint footprint on the piece of paper under the victim's forearm, which matched defendant's right sneaker.

Defendant's blood pattern expert witness testified that the stains on the outside of defendant's right sneaker were wipe pattern marks caused by contact with a bloody object, not spatter. He further testified that the blood stains on the inside of the left sneaker, unlike the wipe pattern on defendant's right sneaker, were the stains to be expected when someone steps in a puddle of blood. He noted the absence of blood on the tops of defendant's shoes, and said that the placement of the stains was more consistent with contact with blood after an attack.

Defendant introduced a number of witnesses to support his theories of third-party guilt. This included the claim that the person who notified police upon discovering the body should actually have been a suspect, as that individual's wife had allegedly been unfaithful to him with Verdicchio.

 A-5304-15T2

Defendant also presented testimony suggesting that the victim had homosexual affairs. After death, the victim's body was examined by a sexual assault nurse who performed a rape kit, although it was never sent to a laboratory for testing. Defense counsel argued the examination supported the theory that the killing may have been the product of a homosexual confrontation.

Prior to trial, the court denied defendant's motion to suppress the contents of the bins and the shoebox. Although Kosker testified at the hearing that she knowingly and voluntarily signed the consent to search, she insisted that she was confused, felt ill, and would not have agreed had she known that she had the right to refuse. Kosker admitted, when shown the consent to search form a second time, that she had understood she had the right to refuse.

The judge who presided over the motion concluded that Kosker's verbal agreement and signature on the waiver were dispositive. In addition to Kosker's testimony during the hearing, he watched the videotape of the consent, given at the station. The judge also concluded that nothing the officers said or did could be characterized as coercive, threatening, "or even misleading[.]" The judge did not find Kosker's testimony to be credible, and described her as having been "evasive and contradictory[.]" He further found that she had standing to consent to the search of the bins and the shoebox because the items were located in her

residence, she had actual control over them, and she had the appearance of control over the items.

During the trial, the court conducted a Sands[3] hearing to decide the admissibility of defendant's prior convictions, should he choose to testify. The State sought to introduce defendant's first-degree armed robbery and drug possession conviction from 1993, which resulted in a fifteen-year sentence, a 2000 third-degree theft conviction, which resulted in a four-year term of probation, and a fourth-degree 2011 criminal trespass charge downgraded to a disorderly persons conviction. The judge decided that the 1993 and the 2000 convictions could be admitted as defendant's prior criminal history was woven together by proximity in time to the 2011 charge.

Defendant raises two issues for our consideration:

> POINT I
> THE POLICE DID NOT HAVE CONSENT, NOR COULD THEY REASONABLY HAVE BELIEVED THAT THEY HAD CONSENT, TO SEARCH THE STORAGE BINS BASED ON KOSKER'S RELINQUISHMENT OF THE BINS WHEN THE BINS WERE KNOWN TO BELONG TO DEFENDANT. THE CONTENTS OF THE BINS SHOULD BE SUPPRESSED AND THE CONVICTIONS REVERSED.

---

[3] State v. Sands, 76 N.J. 127, 144 (1978).

POINT II

POINT II
THE COURT ERRED IN ALLOWING THE STATE
TO INTRODUCE TWENTY-THREE[] AND
SIXTEEN-YEAR-OLD CONVICTIONS TO AFFECT
DEFENDANT'S CREDIBILITY.

I.

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (citation omitted); State v. Gamble, 218 N.J. 412, 424 (2014). Additionally, we "defer[] to those findings of the trial judge which are substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case . . . ." State v. Johnson, 42 N.J. 146, 161 (1964). Due to the trial court's unique perspective, its findings should only be disturbed if they are, "'clearly mistaken' or 'so wide of the mark' that the interests of justice requir[e] appellate intervention." Elders, 192 N.J. at 245 (citing N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). Only then should an appellate court "appraise the record as if it were deciding the matter at inception and make its own findings and conclusions." Ibid. (citations omitted). "A trial court's interpretation of the law, however, and the consequences that

flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425.

In considering whether to suppress evidence obtained from a search and seizure, courts must balance the government's interest in investigation with an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. In order for a government search to be constitutionally valid, it must be either pursuant to a warrant or voluntary consent.[4] See ibid.; N.J. Const. art. I, ¶ 7. According to the New Jersey Constitution, the validity of a consent-based search is based on the State meeting its burden of "showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent." State v. Johnson, 68 N.J. 349, 353-54 (1975).

It is also true that a third party or someone other than the owner of the property can give consent to a search, so long as the consenting individual "possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974); see also State v. Coyle, 119 N.J. 194, 215 (1990). However, a

---

[4] Other exceptions exist, but they are not relevant to this case. See State v. Pineiro, 181 N.J. 13, 20-21 (2004).

A-5304-15T2

third party's authority to consent rests "on mutual use of the property by persons generally having joint access or control" of the property, such as co-inhabitants who may "assum[e] the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7.

Nevertheless, if a government search was conducted erroneously yet upon reasonable belief that the third party possessed authority over the property, there will be no constitutional violation. State v. Suazo, 133 N.J. 315, 320 (1993) (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)). If circumstances suggest that "the property to be searched belongs to someone other than the consenting party," however, such consent becomes "questionable" and the search may be rendered an unreasonable constitutional violation. Id. at 322. Such circumstances exist when a third party disclaims ownership of property, or generally "lack[s] the authority to consent to a search of specific containers found on those premises." Id. at 320.

Defendant contends that Kosker, in line with the limits expressed in Suazo, could not consent to the search of the contents of the plastic bins. Further, police knew the items did not belong to her, and that she had merely been asked to remove the materials from the storage unit and hold them. This is unlike a situation in which the owner of a car consents to a search of bags in

the trunk while the owner of the item objects, such as in Suazo.  Id. at 322-23.  But police knew the items in the storage bins and the shoe box belonged to defendant and not to Kosker.  Kosker told them that defendant had requested that she discard only the guns.  Under these circumstances, the police were not justified in eliciting her permission to search the containers.  They could not have reasonably believed she had the authority to consent to the search, nor could they have concluded that she had the apparent authority to consent.

Acknowledging that the contents belonged to defendant and not to Kosker, the court nonetheless relied on Kosker's appearance of authority.  The judge opined that because she had been asked to take the bins home, she even had the actual authority to consent to the search.  But that decision conflated her authority to hold the containers with the authority to dispose of the contents, other than the handgun, which she did not have.  Therefore, the search was unlawful and the motion to suppress should have been granted.

We do not set aside a judge's discretionary rulings regarding the admission of evidence lightly.  We do so only when it appears there has been a clear error of judgment, in this case, a mistaken application of the legal principles regarding the apparent authority to consent to a search of the contents of containers.  See State v. J.A.C., 210 N.J. 281, 295 (2012).  Despite this misapplication of the

relevant law, we do not consider the admission of the evidence to have prejudiced defendant's right to a fair trial in light of the State's overwhelming proofs. See State v. Prall, 231 N.J. 567, 581 (2018).

Among other things, the State's case consisted of defendant's own statements, the fact he was seen at the victim's home during the relevant timeframe, defendant's blood-stained shoes, and defendant's sneaker print outlined in blood beneath the victim's arm. Under these circumstances, the admission of the victim's belongings from defendant's bins was not clearly capable of producing an unjust result. See R. 2:10-2. This is one of those "rare case[s]" in which the erroneous admission of evidence does not suffice "to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." Prall, 231 N.J. at 588 (citing State v. Daniels, 182 N.J. 80, 95 (2004)). Thus, although the police should not have searched the bins and shoebox, the admission of the contents is not a basis for reversal.

II.

According to N.J.R.E. 609(b)(1), evidence of prior convictions older than ten years are admissible where the "probative value outweighs [the] prejudicial effect." The probative value is determined by balancing the nature and seriousness of the offenses with remoteness to the current matter. N.J.R.E.

609(b)(2). Where intervening offenses can cure remoteness and thus bridge the gap to older more remote crimes, then the earlier conviction will also be admitted. Sands, 76 N.J. at 145. N.J.R.E. 609(b)(1) shifts the burden of proof to the proponent of the evidence. It is this section of the Rule which defendant claims was violated. Defendant argues that the calculation should be made from his 1998 release, and that the intervening 2013 theft conviction, a petty disorderly persons offense, cannot be counted.

Defendant was released from prison in 1998 after his 1993 conviction for armed robbery and drug possession. Defendant was again convicted of an indictable theft offense in 2000, resulting in a four-year probation term. The 2011 theft charge, however, ultimately resulted in the 2013 petty disorderly persons conviction.

In State v. Harris, 209 N.J. 431 (2012), the Court upheld the admission of two fourteen-year-old convictions where there had been seven intervening convictions for disorderly persons and petty disorderly persons offenses. Id. at 444-45. In Harris, the seven convictions occurred almost annually until defendant's trial. Id. at 436.

But the calculation of the ten-year period, and the applicability of the rule, is made from the last indictable conviction and service of sentence, not the first.

This means that even before reaching the issue of "bridging," the calculation is made from defendant's release from probation in 2004, less than ten years from this crime. The only offense that "bridged" and wove together defendant's prior criminal history was the 2011 petty disorderly persons offense, charged originally as a criminal trespass. A judge has broad discretion in making evidentiary rulings such as this one. Id. at 442; Sands, 76 N.J. at 144. Our decision should not be read as meaning that in every case in which N.J.R.E. 609(b)(1) applies, one disorderly persons conviction in the course of years suffices, because this timeframe does not implicate that section of the rule. Defendant stopped serving his probationary term in 2004. His next offense occurred nine years later. Thus, the criminal history does not fall within the second section of the rule. See N.J.R.E. 609(b)(1).

Absent an abuse of discretion or clear error of judgment, neither of which occurred here, a trial court's decision to admit prior convictions will not be disturbed. See Harris, 209 N.J. at 439. We see no basis in the law to interfere with the judge's decision in balancing these equitable considerations. Applying our normal deferential standard, there was no abuse of discretion in the trial judge's decision that defendant's prior criminal history showed an inability to

16

comply with the bounds of behavior imposed on all citizens.  See Sands, 76 N.J. at 145.

    Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION