# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0700-20

B.L.D.,

 Plaintiff-Respondent,

v.

C.M.C.,

 Defendant-Appellant.

_____

   Submitted January 3, 2022 – Decided January 21, 2022

   Before Judges Sumners and Vernoia.

   On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FV-19-0066-21.

   Gruber, Colabella, Liuzza, Thompson & Hiben, attorneys for appellant (Mark Gruber and Natalie L. Thompson, on the brief).

   Legal Services of Northwest Jersey, attorneys for respondent (Colleen M. Cunningham, on the brief).

PER CURIAM

Defendant, C.M.C., appeals from a final restraining order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1]  After a plenary hearing, the trial court found defendant committed the predicate acts of harassment, N.J.S.A. 2C:33-4, and contempt, N.J.S.A. 2C:29-9(b).  See N.J.S.A. 2C:25-19(a)(13), (17).  Defendant claims the court applied the wrong legal standard in determining he committed the predicate act of harassment; there is insufficient evidence supporting the court's finding he committed the predicate act of harassment; the court erred in admitting and excluding certain evidence; and the evidence does not support the court's determination an FRO is necessary to protect plaintiff, B.L.D., from future acts of domestic violence.  Having reviewed the record in light of the applicable legal principles, we affirm in part, vacate in part, and remand for further proceedings.

I.

Plaintiff applied for, and was granted, a domestic violence temporary restraining order (TRO) against defendant in the early morning hours of August 14, 2020.  Plaintiff's complaint alleged the predicate act of harassment.  Plaintiff

---

[1] We use initials to identify the parties because the names of victims of domestic violence are excluded from public access under Rule 1:38-3(d)(10).

subsequently amended the TRO on August 21, 2020, to add prior alleged acts of domestic violence, and, ten days later, she further amended the complaint to assert two additional predicate acts of domestic violence, alleging defendant committed the offense of contempt by contacting plaintiff on two occasions following his receipt of the TRO.

During the plenary hearing on the FRO, plaintiff and defendant were the sole witnesses. Each party also presented documentary evidence.[2] We summarize the testimony and evidence presented to provide context for our analysis of the parties' arguments on appeal.

The Parties' Relationship Prior to August 13, 2020

Plaintiff and defendant had a six-year dating relationship, were engaged to be married for five years, and had child prior to the August 13, 2020 incident at their residence that resulted in the entry of the FRO. During the plenary

_____

[2] The record on appeal does not include all the evidence admitted at trial. See generally R. 2:6-1(a) (requiring the appellant's appendix, or the parties' joint appendix, include the parts of the record "as are essential to the proper consideration of the issues"). We do not discern, however, that defendant's failure to provide all the evidence presented at the plenary hearing prevents a full and fair analysis of the issues presented on appeal. See generally Soc. Hill Condo. Ass'n v. Soc. Hill Assoc., 347 N.J. Super. 163, 177-78 (App. Div. 2002) (explaining a reviewing court may decline to address an issue where the parts of the record pertinent to the issue are not included in the record on appeal).

A-0700-20

hearing, plaintiff described incidents occurring prior to August 13, 2020, that she claims constituted acts of domestic violence.

Plaintiff testified that early in their relationship, she was in a car with defendant when he received information about a case involving his ex-wife. According to plaintiff, defendant became so enraged by the news that he "slammed his fist and punched the center console screen and broke it and it shattered." Defendant did not threaten or touch her during the incident, but plaintiff explained that "it scared the living daylights out of [her] sitting in the passenger seat right next to him."

Plaintiff further described an incident in August 2017 after she and defendant moved into a home together. They argued about "having sex that night," because defendant wanted to have sex and plaintiff did not. Plaintiff attempted to leave the home, but defendant "block[ed] her path from leaving the door for a few minutes." When defendant let plaintiff leave, she slept in her car until the morning hours when she returned home.

Plaintiff also recounted a 2017 incident at the place defendant and plaintiff then worked. Plaintiff testified defendant berated her, "scream[ed] at [her] for absolutely nothing, [and] call[ed] [her] all types of names" in front of another

A-0700-20

employee. Plaintiff acknowledged that defendant's statements were, at least in part, related to work she was supposed to have done, but she had not completed.

According to plaintiff, defendant also accompanied her to a regular gynecological appointment because he believed "there was a problem of why [she] wasn't having so much sex and why [she] didn't want to as much as he did." Plaintiff testified she was embarrassed by defendant's appearance at the appointment because she knew she did not have any medical issues.

In December 2019, defendant started an appliance repair business, and plaintiff quit her job and thereafter worked for defendant's new company. She answered phone calls, set up appointments, ordered parts, operated the business's office, and she worked from the home she shared with defendant, which allowed her to care for their daughter.

In February 2020, while plaintiff was in the car with defendant and their daughter, defendant was "speeding down the winding roads" and plaintiff told him to slow down. Defendant turned the car around, returned to their home, got out of the car, and drove off in another car. Plaintiff called defendant, who answered and told plaintiff he "hope[d] [she] died, screaming it over the car phone where [their] daughter," who was in back seat, "could hear everything."

A-0700-20

Plaintiff explained that she suggested counseling to defendant to address their problems. She wrote defendant a letter in the beginning of August 2020 describing their issues, her interest in working things out with him, and informing him she thought that to fix their relationship she should move out to "get[] some space." The letter explained they could still see each other, and share time with their daughter, but she wanted to "just at least get that space that [they] needed to work on the relationship."

Defendant sent plaintiff a typed letter in response. As plaintiff described defendant's letter, defendant said plaintiff "wasn't moving out" of their home with their daughter. Plaintiff testified defendant's letter scared her because she "knew no matter what was going to happen, he was never going to let [her] leave the house, let alone take [their] daughter." In response to her receipt of the letter, plaintiff began making accommodations at her parents' home for her and the parties' daughter. Plaintiff wanted a place for her and the child in the event she moved out of the home she shared with defendant. Plaintiff also wanted to be able to demonstrate to the police or the New Jersey Department of Child Protection and Placement (DCPP) that she had a safe place for the child in the event defendant called either of them if she and the child moved from the home they shared with him.

A-0700-20

Plaintiff and her daughter moved into her parents' home on August 3, 2020, because plaintiff's and defendant's home lost its electricity and running water for a number of days due to a storm. Defendant contacted plaintiff on August 8, 2020, and told her he would call the police and DCPP if their child was not in her bed at their home by the weekend. Defendant threatened to have plaintiff "arrested for kidnapping [their] daughter." Plaintiff and the child returned to the home.

A couple of days prior to August 13, 2020, plaintiff and defendant had a conversation in their home in front of their two-year old daughter that plaintiff recorded. Defendant told plaintiff she was "the fucking issue," and he made a statement, he was "going to smash the shit in front of" that was interrupted by their daughter saying, "mommy."

Plaintiff then asked defendant if he wanted to cook dinner or hang out with their daughter while plaintiff cooked dinner. In response, defendant said, "[f]uck yourself." Plaintiff again asked defendant if he would "hang out" with their daughter while she cooked dinner, and defendant said only, "[f]uck you." Plaintiff testified that during the confrontation, defendant "poked her chest, but it wasn't like an aggressive really poke."

A-0700-20

Plaintiff explained she did not report the incident to the police because defendant told her that if the police get involved "we were done." Defendant also told plaintiff, "I went to jail for one bitch, I'm not going to jail for two." As defendant explained during his testimony, plaintiff was aware he had a prior conviction for domestic assault of his ex-wife in Florida, and that he was incarcerated as a result, because he informed plaintiff of that history when they first started dating.

Plaintiff testified defendant never physically assaulted her, or touched her inappropriately, during any of the incidents she described.

The August 13, 2020 Incident

According to plaintiff, on the evening of August 13, 2020, defendant asked if they were going to be intimate that evening, and an argument ensued when she said "no."[3] Defendant wanted an explanation "as to what was happening in [their] relationship." When plaintiff did not answer, defendant took the cellphone from plaintiff's nightstand, and removed the phone's SIM

---

[3] Plaintiff recorded portions of the argument with defendant, and her conversations with her mother. The recording was admitted in evidence, and the portions of the recording played during the hearing were transcribed and are included in the hearing transcript. Our summary of the argument and conversation is based on both plaintiff's testimony and the transcription of the recording included in the hearing transcript.

card.  The phone was owned by defendant's appliance repair company, but plaintiff used it as her personal phone and in her role as an employee of defendant's business.

Defendant "wanted an answer as to why [plaintiff] wasn't going to be intimate with him and wanted to know what was going to be happening." Defendant said if they were not "going to be having sex, that [they] weren't in a relationship," and he wanted plaintiff "to start splitting the bills on the home evenly." Defendant disputed plaintiff's claimed ownership of the phone and SIM card, repeatedly asserting they were his property and plaintiff did not contribute to the purchase of either.

After defendant removed the SIM card from plaintiff's phone, she attempted to retrieve it from his hand by bending his finger.  Defendant said to plaintiff, "[j]ust remember.  If I grab you by the neck and throw you across the room, that's assault too."  Plaintiff testified defendant's statement "scared her enough" that she stepped away from him "because he made physical threats before but never followed through," and "with how heated the argument was[,] . . . it definitely made [her] nervous."

Plaintiff explained she wanted her phone so she could immediately contact her "family to let them know what was happening," and she could not do that

9 <span>A-0700-20</span>

without her cellphone "handy right next to" her. She told defendant she was going to call her father "and make him come over," and defendant said, "[t]hen your dad's going to get his ass kicked in [defendant's] house."[4]

Plaintiff used a phone in another room to call her parents. She told them she did not have a SIM card in her cellphone. A short time later, plaintiff heard defendant on a phone call with her father, with defendant "screaming at the top of his lungs, waking up [the parties'] daughter." According to defendant, plaintiff's father said he was going to come to plaintiff's and defendant's home if defendant did not return the SIM card to her.

Plaintiff then used a laptop computer to "Facetime" audio conference with her mother. She told her mother to advise her father to stop arguing with defendant and "hang up the phone" with defendant. During this time, plaintiff could hear defendant screaming over the phone at her father.

Defendant "hung up on [plaintiff's] father," and returned to plaintiff "to try to return the SIM card device." When defendant returned, plaintiff left open the audio conference connection with her mother. Defendant yelled at plaintiff, told her "it was all [her] fault and that [there are] consequences for [her]

_____

[4] The testimony of the parties established that the home in which plaintiff and defendant resided was not solely his house. It was jointly leased by plaintiff and defendant.

10

actions." Defendant said to plaintiff, "[s]hut up and listen. Here's your SIM card," but plaintiff said she did not want it. Defendant said, "your dad is making threats . . . that if you don't call him from your cellphone, he's coming over here." Plaintiff reiterated she did not want the SIM card, and defendant said, "And if you don't want your father to lose his life or his head . . . over this cellphone."[5]

Defendant accused plaintiff of "blatant . . . disrespect" of him, and plaintiff asserted the confrontation began because she "didn't want to have sex with" him. Defendant said plaintiff did not understand the principle of why he took the SIM card, and he told plaintiff "[w]e're done." Defendant told plaintiff that if her father came to their house, defendant was "dropping him on the . . . ."[6] Plaintiff said she did not want the SIM card, she would get her own phone plan, and she was leaving the home. Defendant said plaintiff could have the SIM card, and plaintiff responded, "I don't even care. I don't even want it back."

---

[5] We observe defendant's statement appears incomplete, but we quote directly from the hearing transcript plaintiff's version of what defendant said.

[6] The hearing transcript shows the word or words defendant said following "dropping him on the" are "indiscernible" on the recording.

11

Plaintiff then spoke to her mother, who informed her that her father called the police. Plaintiff expressed dissatisfaction with her mother that the police had been called. The police arrived at the parties' residence minutes later. Plaintiff then applied for, and obtained, the TRO.

At the FRO trial, defendant did not dispute the accuracy of the recording of the parties' confrontation, or that he made the statements and took the actions – including removing the SIM card from plaintiff's phone – plaintiff described during her testimony. Defendant denied the confrontation was in response to plaintiff's refusal to be intimate with him, and he explained he simply attempted to make clear to plaintiff that if they did not have an intimate relationship, it was necessary for her to contribute equally to the payment of the parties' expenses, including her share of the cost of her phone. Defendant explained the argument ensued because plaintiff was disrespectful to him when he attempted to convey his message about sharing expenses because rather than listen and respond to him, plaintiff sat on the bed playing a video game on her phone.

The Violations of the TRO

During the early morning hours of the day following the August 13, 2020 incident, plaintiff obtained a TRO against defendant. The TRO prohibited defendant "from having <u>any</u> oral, written, personal, electronic, or other form of

contact or communication with" plaintiff.  As noted, plaintiff amended her complaint twice, and obtained amended TROs.  In the first amendment, plaintiff added claims of prior acts of domestic violence, and, in the second, plaintiff added a claim defendant committed the predicate act of contempt by violating the no-contact provision of the TRO on two occasions.

During the plenary hearing on the FRO, plaintiff testified that on August 18, 2020, four days after defendant was served with the TRO, he contacted her through her Instagram account.  On that day, plaintiff noticed a question mark beneath a photo on her Instagram account, and the question mark "comment" came from defendant's business' Instagram account. The following day, plaintiff received another comment on one of her Instagram posts from defendant's Instagram business account stating, "can we talk about this[?]"  Defendant denied posting the question mark and comment, claiming plaintiff also had access to the Instagram business account.

Plaintiff also testified that August 29, 2020, during an exchange of their daughter outside a police station, defendant asked plaintiff if they could talk "for a minute."  Plaintiff said, "no."  The following day, defendant handed her a pair of reading glasses.  Plaintiff said she did not need the glasses, and she tossed

them into a cup holder in her vehicle. Plaintiff explained she later found a folded piece of paper within the glasses with a note from defendant typed on it.

The note, which is dated August 29, 2020, states defendant is sorry for the August 13, 2020 incident, and that he had made an appointment for counseling. In the letter, defendant also acknowledges he has anger issues. Defendant testified he gave plaintiff the glasses because he was concerned with her driving without them with their daughter. Defendant denied authoring the letter or including it with the glasses, and he testified he did not type letters but only handwrote them.

The Court's Decision

Following the testimony, the court rendered a decision from the bench. The court first addressed the issue of credibility, finding that based on plaintiff's demeanor, her recall, and the consistency of her version of the facts, she was a credible witness. The court found defendant was not a credible witness because his explanations for his conduct during the August 13, 2020 incident – including his removal of the SIM card and his threats of violence concerning plaintiff's father – "did not comport with common sense."

The court reviewed plaintiff's testimony concerning prior incidents between the parties, and generally concluded they showed defendant had a

A-0700-20

history of attempting to exercise dominance or control over plaintiff. The court found the parties had a history of arguments over intimacy and sex, and during those arguments defendant would call plaintiff names that "made her feel bad about herself and less of a person."

The court also noted defendant's claim that his actions on August 13, 2020, were not in response to plaintiff's refusal to be intimate with him were belied by the timing of the events about which he otherwise testified. The court found defendant made the statement about grabbing plaintiff around the neck and throwing her across the room, and that it caused plaintiff to back-off and stop her efforts to get the SIM card. The court further found defendant's testimony he did not author the letter plaintiff found in the glasses because he hand-wrote his letters was undermined by the letter defendant admitted writing to plaintiff in August 2020, which is typewritten.

Based on its acceptance of plaintiff's version of the events, the court determined defendant committed the predicate act of harassment under N.J.S.A. 2C:33-4 during the August 13, 2020 incident. See N.J.S.A. 2C:25-19(a)(13). In making that finding, the court considered prior incidents of conduct, including threats of violence, between the parties.

15

The court also accepted plaintiff's testimony concerning defendant's post-TRO contacts with her – first over Instagram and then with the delivery of the note in the glasses – following service of the TRO on defendant. The court rejected as incredible defendant's denial of the alleged actions. The court concluded defendant's contacts with plaintiff in violation of the TRO constituted the predicate act of contempt under N.J.S.A. 2C:29-9(b)(1). See N.J.S.A. 2C:25-19(a)(17).

The court last determined an FRO was necessary to protect plaintiff from future actions of domestic violence. The court considered the totality of the circumstances, including defendant's actions and threats of violence during the August 13, 2020 incident; that some of defendant's actions took place in front of the parties' young daughter; the parties' prior history; and defendant's violations of the TRO. The court further observed that defendant's actions exhibited a course of coercion and control over plaintiff during their relationship. The court entered the FRO, and this appeal followed.

## II.

Our scope of review of Family Part orders is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). We owe substantial deference to the Family Part's findings because of its special expertise in family matters. Id. at 413. Deference

is especially appropriate in bench trials when the evidence is "largely testimonial and involves questions of credibility." Id. at 412. A trial judge who observes witnesses and listens to their testimony is in the best position to "make first-hand credibility judgments about the witnesses who appear on the stand[.]" N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008). Also, we will not disturb a trial court's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we do not accord such deference to legal conclusions, and review such conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); see also N.J.S.A. 2C:25-18. Consequently, "[o]ur law is particularly solicitous of victims of domestic violence," J.D. v. M.D.F., 207 N.J. 458, 473 (2011) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[ ] [the PDVA] to achieve its salutary purposes," Cesare, 154 N.J. at 400.

When considering whether the entry of an FRO is appropriate, a trial court must "determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(]a[)]] has occurred." Silver v. Silver, 387 N.J. Super. 112, 125 (App. Div. 2006). The judge must construe any such acts in light of the parties' history to better understand the totality of the circumstances of the relationship and to give context to otherwise ambiguous behavior. N.J.S.A. 2C:25-29(a)(1); J.D., 207 N.J. at 479. Trial courts may "consider evidence of a defendant's prior abusive acts regardless of whether those acts have been the subject of a domestic violence adjudication." N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 574 (App. Div. 2010) (quoting Cesare, 154 N.J. at 405).

If the court finds the defendant has committed a predicate act of domestic violence, then the second inquiry "is whether the court should enter a restraining order that provides protection for the victim." Silver, 387 N.J. Super. at 126. While the second inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(]a[)](1) to - 29[(]a[)](6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127; see also J.D., 207 N.J. at 475-76.

18

A court is required to make specific findings of fact and state its conclusions of law. R. 1:7-4. A court's failure to comply with Rule 1:7-4(a) "constitutes a disservice to the litigants, the attorneys and the appellate court." Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)). "Naked conclusions do not satisfy the purpose of [Rule] 1:7-4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions." Curtis, 83 N.J. at 570.

Here, defendant does not challenge the court's determination he committed the predicate act of contempt by violating the no-contact provision of the TRO on two occasions. Based on our review of the record, we are satisfied the evidence amply supports the court's finding. In its opinion, the court defined the elements of the offense under N.J.S.A. 2C:29-9(b) and correlated its findings of fact to those elements to support its conclusion defendant committed the offense by contacting plaintiff directly on her Instagram account and by speaking to her about the glasses and placing a note to her in the glasses he gave to her. Because there is substantial credible evidence supporting the court's findings and conclusion, we discern no basis to reverse the court's determination defendant committed the predicate act of contempt. See Cesare, 154 N.J. at 411-12.

Defendant argues the court erred by finding he committed the predicate act of harassment. As noted, he contends the evidence is inadequate to support a finding he committed the offense of harassment under any of the subsections of N.J.S.A. 2C:33-4. He also argues the court applied the wrong legal standard in concluding he violated the statute.

In pertinent part, N.J.S.A. 2C:34-4 provides that a person commits the offense of harassment if, "with purpose to harass another," he or she:

> (a) Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively course language, or any other manner likely to cause annoyance or alarm;
>
> (b) Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> (c) Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

To establish harassment under each subsection of the statute, a plaintiff must prove the defendant acted with the purpose of harassing the victim. Hoffman, 149 N.J. at 577. "A finding of a purpose to harass may be inferred from the evidence presented," ibid., and "courts must consider the totality of the circumstances to determine whether the harassment statute has been violated," Cesare, 154 N.J. at 404. "Common sense and experience" also inform the

decision whether a defendant acted with a purpose to harass.  <u>H.E.S. v. J.C.S.</u>, 175 N.J. 309, 327 (2003) (quoting <u>Hoffman</u>, 149 N.J. at 577).  Because direct proof of intent is often absent, "purpose may and often must be inferred from what is said and done and the surrounding circumstances," and "[p]rior conduct and statements may be relevant to and support an inference of purpose."  <u>State v. Castagna</u>, 387 N.J. Super. 598, 606 (App. Div. 2006); <u>see also</u> <u>State v. Burkert</u>, 444 N.J. Super. 591, 601 (App. Div. 2016).  "The victim's subjective reaction alone will not suffice; there must be evidence of the improper purpose."  <u>J.D.</u>, 207 N.J. at 487.

To establish a defendant committed harassment, a plaintiff must also prove a violation of one or more of the three subsections of the statute.  <u>See</u> N.J.S.A. 2C:33-4(a) to (c).  "Each of those three subsections is 'free standing, because each defines an offense in its own right.'"  <u>Hoffman</u>, 149 N.J. at 576 (quoting <u>State v. Mortimer</u>, 135 N.J. 517, 525 (1994)).  To establish a violation of subsection (a), a plaintiff must prove:

> (1) defendant made or caused to be made a communication; (2) defendant's purpose in making or causing the communication to be made was to harass another person; and (3) the communication was in one of the specified manners or any other manner similarly likely to cause annoyance or alarm to its intended recipient.

Ibid.

Under subsection (a), "annoyance means to disturb, irritate, or bother." Id. at 580. In addition, subsection (a) "should generally be interpreted to apply to modes of communicative harassment that intrude into an individual's 'legitimate expectation of privacy.'" Id. at 583 (citation omitted).

In contrast, subsection (b) "deals with touchings or threats to touch, and it does not require the intended victim to be annoyed or alarmed." Id. at 580. Under subsection (b)'s plain language, a person commits harassment if, with purpose to harass, he or she threatens to strike, shove or otherwise offensively touch the victim. N.J.S.A. 2C:33-4(b); see also State v. Berka, 211 N.J. Super. 717, 721 (Law Div. 1986) (finding elements of an offense under N.J.S.A. 2C:33-4(b) include acting with purpose to harass by "subjecting the victim to [a] threat, by means of a physical menace, which . . . produces a reasonably-founded alarm on the part of the victim").

"Subsection (c) proscribes a course of alarming conduct or repeated acts with a purpose to alarm or seriously annoy an intended victim." Hoffman, 149 N.J. at 580. To establish a violation of subsection (c), a plaintiff must prove the defendant intended a more "serious" form of annoyance than is required under subsection (a). Id. at 580-81. "[S]erious annoyance under subsection (c) means

22

to weary, worry, trouble, or offend." Id. at 581. "The primary thrust of [subsection (c)] is not to interdict speech, but rather conduct," Burkert, 231 N.J. at 273, but our Supreme Court has noted that "in certain clearly defined circumstances, speech can take the form of conduct and therefore be the appropriate focus of a subsection (c) prosecution," id. at 274.

We have briefly described the elements of the separate offenses defined in the three subsections of N.J.S.A. 2C:33-4 to illustrate that a finding a defendant committed any one of them requires a painstaking and often complex analysis of the evidence to determine whether there is sufficient proof to establish the elements of the offenses, and, if so, whether the defendant acted with the purpose to harass. In accordance with Rule 1:7-4, a court must make clear and specific findings of fact as to each element of each offense, and it must correlate those findings of fact to the essential elements of an offense to support a legal conclusion whether the offense was committed or not. See generally Curtis, 83 N.J. at 570.

Here, the court summarized the evidence, and made many generic findings of fact, but it did not correlate the findings to the essential elements of the three harassment offenses set forth in N.J.S.A. 2C:33-4. The court referred to subsections (a) and (c), but never mentioned subsection (b). The court found

23

defendant acted with a purpose to harass, but in concluding defendant committed the offense of harassment, the court did not make any findings as to the elements of the separate offenses under N.J.S.A. 2C:33-4 or find facts supporting a determination plaintiff proved the elements of one or more of the offenses.

As defendant correctly argues, the court focused on what it considered to be defendant's effort to dominate and control plaintiff as the basis for its finding defendant committed the offense of harassment. Although "[d]omestic violence is a term of art that describes a pattern or abuse and controlling behavior which injures its victims," Corrente v. Corrente, 281 N.J. Super. 243, 246 (App. Div. 1995), a court may not enter an FRO unless it first makes findings supporting a determination the plaintiff proved each element of a predicate act of domestic violence under the PDVA, Silver, 387 N.J. Super. at 125. Here, the court found defendant harassed plaintiff but never identified which, if any, subsection of N.J.S.A. 2C:33-4 it concluded he violated, and the court did not make findings of fact correlated to the elements of any of the harassment offenses in the statute.

Accordingly, we vacate the court's order finding defendant committed the predicate act of harassment and we remand for further proceedings. The court shall reconsider its determination defendant committed the predicate act of harassment based on the evidence presented at the plenary hearing, make

detailed findings of fact correlated to the elements of the various offenses defined under N.J.S.A. 2C:33-4, and proceed accordingly based on its conclusion.

If the court determines defendant did not commit the predicate act of harassment, it shall determine whether an FRO is necessary to protect plaintiff from immediate danger or future acts of domestic violence based solely on defendant's commission of the predicate act of contempt. If the court finds defendant committed the predicate act of harassment as alleged on August 13, 2020, the court shall again consider, determine, and make findings of fact and conclusions of law as to whether an FRO is required under the Silver standard. See Silver, 387 N.J. Super. at 126-27. In determining whether an FRO is necessary, "the court should consider and make specific findings on the previous history of domestic violence, if any, between . . . plaintiff and defendant, and how that impacts, if at all, on the issue of whether a restraining order should issue," id. at 128, and the court shall evaluate and make findings as to the factors set forth in N.J.S.A. 2C:29(a)(1) to -(6), id. at 127. We do not offer an opinion on the merits of any of those issues, and we leave in the court's discretion whether it will accept supplemental written submissions and hear additional argument from the parties on the issues on remand.

We next consider defendant's arguments addressed to the court's evidentiary rulings. Defendant first claims the court erred by permitting plaintiff's counsel to question him about whether he had a prior criminal conviction for domestic battery in Florida. As defendant acknowledges, the court only permitted defendant to testify about the prior conviction, and not the underlying incident supporting the conviction, because the prior conviction bore on his credibility. The court also permitted the testimony because there was no dispute plaintiff was aware of it and, according to the court, plaintiff's knowledge of the conviction was relevant to plaintiff's fear of defendant pertinent to a determination under the second prong of the Silver standard. Defendant claims the court erred by not permitting him to testify about the incident underlying the conviction.

We review a court's evidentiary rulings "under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). We review "a trial court's evidentiary ruling only for a 'clear error in judgment,'" State v. Williamson, 246 N.J. 185, 199 (2021) (quoting State v. Medina, 242 N.J. 397, 412 (2020)), and set aside a ruling only where, we are

"convinced that 'the trial court's ruling is so wide of the mark that a manifest denial of justice resulted[,]'" ibid. (quoting Prall, 231 N.J. at 580).

We discern no abuse of discretion in the court's admission of evidence concerning defendant's prior conviction as bearing on his credibility because admission of a prior criminal conviction for that purpose is permitted under N.J.R.E. 609(a).  See State v. Hamilton, 193 N.J. 255, 256 (2008) (explaining N.J.R.E. 609 allows admission of "witness's prior convictions . . . for impeachment purposes").

Evidence concerning defendant's prior conviction was also admissible for the limited purpose of providing context for plaintiff's testimony, to which defendant did not object, that in the days prior to the August 13, 2020 incident, defendant said, "I went to jail for one bitch, I'm not going to jail for two." Plaintiff offered the testimony about defendant's statement in apparent support of her claim it constituted either a threat or some form of intimidation, and the admission of evidence of defendant's conviction explained plaintiff's understanding of the statement and, at least in part, supported her claim she feared defendant based on statements he later made, including those made during the August 13, 2020 incident.  See, e.g., Rosiak v. Melvin, 351 N.J. Super. 322, 327 (Ch. Div. 2002) (finding evidence of a domestic violence

incident between defendant and his previous wife admissible to prove plaintiff's understanding of defendant's otherwise ambiguous threat).

We therefore discern no abuse of discretion in the court's admission of the testimony concerning defendant's prior conviction for the limited purposes the court defined. Moreover, even if the evidence was admitted in error, we do not find its admission was clearly capable of producing an unjust result. R. 2:10-2. The court did not rely on the conviction in making its credibility determinations, and, although the court referenced defendant's conviction in its opinion – when it discussed plaintiff's testimony about defendant's statement – the court did not rely on either the statement or the conviction for any substantive purpose in rendering its findings and conclusions.

Moreover, the court did not abuse its discretion by refusing to permit defendant's request that he be permitted to explain the circumstances surrounding his conviction. The conviction alone is admissible under N.J.R.E 609, and defendant's putative explanation of the circumstances leading to the conviction would not have been probative of any facts at issue at the hearing.

Defendant also contends the court erred by barring his testimony that plaintiff was a daily marijuana user. Defendant argues the evidence was admissible to establish plaintiff's testimony was not credible.

A-0700-20

We reject the argument for two separate but equally dispositive reasons. First, defendant testified a number of times plaintiff was a frequent marijuana user. As a matter of fact, plaintiff's counsel objected to defendant's "constant reference[s] to marijuana" use by plaintiff, and the court overruled the objection. Defendant testified "smoking marijuana . . . is a day-to-day occurrence for" plaintiff; he was frustrated with plaintiff because she did not contribute to the bills, but "there was always a means to purchase marijuana"; and plaintiff attended a marijuana exposition in Washington D.C. Thus, contrary to defendant's claim, the court permitted him to testify about plaintiff's marijuana use.

Second, the court only limited evidence related to plaintiff's marijuana use when defendant sought to testify about the "medical side effect[s]" of plaintiff's marijuana use and the "scientific diagnosis of the side effect of marijuana" on memory. The court did not abuse its discretion by sustaining plaintiff's objection to the testimony. The proffered testimony, which pertained to medical causation and the diagnosis of side effects caused by marijuana constituted subjects is beyond the ken of the average fact-finder and therefore required expert testimony. See generally Townsend v. Pierre, 221 N.J. 36, 53 (2015) (explaining standard for admission of expert testimony, including requirement

29

the testimony "must concern a subject matter beyond the ken of the average juror" (citation omitted)); see e.g., J.W. v. L.R., 325 N.J. Super. 543, 548 (App. Div. 1999) (finding "[i]f [a] [party] seeks to prove causation of a current medical or psychological condition, . . . competent expert testimony would be required").  Because defendant did not offer himself as an expert on the medical side effects of marijuana, and he made no showing he was qualified to testify as an expert on those issues, the court properly barred his testimony.  See Townsend, 221 N.J. at 53.

Defendant also asserts the court erred by permitting plaintiff to testify about the incident during which defendant poked her in the chest because she failed to specifically identify the incident in her complaint.  Defendant contends admission of the testimony violated his due process rights.

In the context of a domestic violence case, due process requires "notice defining the issues and an adequate opportunity to prepare and respond." H.E.S., 175 N.J. at 321-22 (quoting McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 559 (1993)).  Thus, a trial court shall not "'convert a hearing on a complaint alleging one act of domestic violence into a hearing on other acts of domestic violence which are not even alleged in the complaint.'" J.D., 207 N.J. at 478 (quoting H.E.S., 175 N.J. at 322).

30

Nonetheless, a trial court is not required to limit "plaintiffs to the precise prior history revealed in a complaint, because the testimony might reveal that there are additional prior events that are significant to the court's evaluation, particularly if the events are ambiguous." Id. at 479. The Court has explained that

> plaintiffs seeking protection under the [PDVA] often file complaints that reveal limited information about the prior history between the parties, only to expand upon that history of prior disputes when appearing in open court. And it is frequently the case that the trial court will attempt to elicit a fuller picture of the circumstances either to comply with the statutory command to consider the previous history, if any, of domestic violence between the parties, see N.J.S.A. 2C:25-29[(]a[)](1), or to be certain of the relevant facts that may give content to otherwise ambiguous communications or behavior[.]
>
> [Id. at 479.]

Where the trial court allows a plaintiff to expand the history of domestic violence presented at trial, "it has permitted an amendment to the complaint and must proceed accordingly." Id. at 479-80.

Here, plaintiff's complaint generally alleged that she and defendant engaged in frequent arguments, and her testimony about defendant's poking her in the chest was part of her description of an argument between them. When defendant objected to the testimony, claiming he did not have prior notice of

31

that particular allegation, the court offered defendant "additional time to . . . prepare to confront the evidence" before he cross-examined plaintiff. Defendant did not accept the court's offer or request either an adjournment or additional time to address the testimony. Plaintiff testified about the incident on the second day of the hearing, and the next day of the hearing, at which defendant offered his testimony, did not take place until four days later. Defendant, however, never claimed he needed additional time to address plaintiff's testimony about the incident, and never made a request for an adjournment to do so. Based on those circumstances, we find no basis to conclude plaintiff's testimony resulted in a denial of defendant's due process rights.

Any remaining arguments made on defendant's behalf we have not directly addressed are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, vacated in part, and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

32

A-0700-20