**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3805-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GARY R. BROOKS, a/k/a
GARY R. BROOKS, JR.,

     Defendant-Appellant.

_____

Submitted October 16, 2024 – Decided January 27, 2025

Before Judges Sumners, Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 19-10-1452.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Raymond S. Santiago, Monmouth County Prosecutor, attorney for respondent (John J. Santoliquido, Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Gary R. Brooks appeals from his jury trial convictions for attempted murder, conspiracy to commit attempted murder, and various weapons offenses related to a drive-by shooting that injured two victims.[1] He was also convicted of possession of a firearm by a previously convicted felon. Brooks was sentenced to an aggregate fifty-year prison term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He contends the trial court erred in denying his motion to suppress evidence found in the house where he was arrested. He also raises several trial errors in his counselled and self-represented briefs, and challenges the extended term of imprisonment he received as a second offender with a firearm pursuant to N.J.S.A. 2C:44-3(d).

After reviewing the record in light of the parties' arguments and governing legal principles, we affirm defendant's convictions. We remand for resentencing because, as the State concedes, the trial court improperly imposed an extended term of imprisonment based on defendant's prior conviction for possession of a firearm by a previously convicted person, N.J.S.A. 2C:39-7(b), which is not a predicate offense for the mandatory extended term that was imposed.

---

[1] We consider this appeal back-to-back with State v. Jonathan M. Marvine, A-3806-21. Brooks and Marvine were tried together. Because Brooks raises different issues on appeal, we issue separate opinions.

I.

We discern the following procedural history and pertinent facts from the record. In October 2019, codefendants Brooks and Marvine were charged by indictment with first-degree attempted murder of Quamere Smith, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; first-degree attempted murder of J'Kier Perry, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; first-degree conspiracy to commit attempted murder, N.J.S.A. 2C:5-1, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3; second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b). Brooks was also charged with second-degree certain persons not permitted to have firearms, N.J.S.A. 2C:39-7(b)(1).

Defendants' pretrial motion to suppress the evidence seized pursuant to a search warrant was heard on September 29, 2020.[2] On November 5, the motion judge issued an order and written opinion denying defendants' motion.

Brooks and Marvine were tried over the course of eight days in October and November 2021. We briefly summarize the evidence adduced at trial. On

---

[2] Defendant's motion to suppress was heard and denied by a different judge than the one who presided over the jury trial. There was no testimonial hearing. Rather, the motion was decided based on the "four corners" of the affidavit in support of the search warrant.

August 2, 2019, at about 11:30 a.m., police responded to a report that shots had been fired at the intersection of Monroe and Ridge Avenues in Asbury Park. At the scene, Monmouth County Prosecutors Office (MCPO) Detective Wayne Raynor discovered two spent shell casings and broken glass in the street. Upon arriving at Jersey Shore Medical Center to see the victims, Raynor noticed a silver Hyundai Tucson with Texas license plates parked in front of the entrance to the hospital's emergency room. The vehicle had a broken window, bullet holes in the door, and blood-stained seats. Raynor also saw a bullet lodged in the inside frame of the passenger side of the vehicle.

Raynor learned that two individuals, Smith and Perry, were being treated for gunshot wounds in the emergency department. Smith had been struck in the shoulder and neck. Perry had been struck in the head. Both survived. As Raynor was leaving the hospital, a security guard informed him that hospital staff had found another bullet on the floor of the emergency room.

When he returned to the MCPO, Raynor reviewed a video taken by an Asbury Park surveillance camera at the intersection of Monroe and Ridge Avenues at the time of the shooting. He observed the silver Tucson and a white Toyota Corolla at the intersection.

4

Within an hour of the shooting, investigators found the white Corolla parked at a residence on Myrtle Avenue in Neptune Township, several blocks from the intersection where the shooting occurred. Six individuals who were on the front porch of the house, including Brooks and Marvine, were taken into custody.

Police obtained warrants to search the house and the Corolla. Officers discovered two handguns in one of the bedrooms: a 9-millimeter Smith & Wesson and a 9-millimeter Taurus. Officers found a shell casing on the exterior windshield of the vehicle and a black backpack in the back seat. Inside the backpack the police discovered a multi-colored shirt. Brooks was wearing blue jeans and a white T-shirt at the time of his arrest.

The parties stipulated that both unregistered guns were operable and that all the bullets and shell casings found at the crime scene had been fired from the Smith & Wesson. Police determined that Brooks rented the Corolla on July 30, 2019.

Portions of the surveillance video were played for the jury during Raynor's testimony. The video showed a silver Tucson and a white Corolla at the intersection of Ridge and Monroe Avenues at approximately 11:00 a.m. The Corolla pulled alongside the Tucson that was stopped at the intersection and the

5

driver of the Corolla fired several shots from a handgun at the Tucson's driver side window and then drove off.  Another surveillance video captured the Corolla in the vicinity of Monroe and Ridge Avenues minutes before the shooting.  This video also shows the white Corolla turning around to loop back to where the Tucson was traveling.

Raynor testified that two individuals were in the Corolla.  The driver was an African American male with a beard who was wearing a multi-colored shirt and blue pants; the passenger was an African American male of darker complexion than the driver with a beard who was wearing a black shirt with a white Nike insignia on the left side.  Still photos of the individuals depicted in the video were shown to the jury.

Perry testified for the defense.  He stated that he and Smith, his brother, were driving in Asbury Park when a car pulled up alongside theirs and stopped. The driver rolled down the window, pulled out a gun, and began shooting.  Perry testified that Brooks was not the shooter, and Marvine was not a passenger in the car.

Izais Normil, one of the individuals who was on the front porch of the Myrtle Avenue residence when the police arrived, also testified for the defense. Normil testified he was at the Myrtle Avenue residence on the morning of

6

August 2, 2021 with Brooks and another male, Dennis Power. The white Corolla was there as well. At around 10:00 a.m., Power drove off in that vehicle while Normil and Brooks left in Normil's vehicle.

Normil and Brooks picked up another individual, Sudan Harris, and drove to Asbury Park municipal court. Normil and Harris went into the municipal building while Brooks waited in the car. After about twenty to thirty minutes, the three drove to an outlet store. After shopping for about forty minutes, they drove back to the Myrtle Avenue residence.

Upon returning, Normil saw the white Corolla parked outside, but Power was not there. Brooks could not find his keys to the Corolla. At this point, Marvine's girlfriend dropped him off at the Myrtle Avenue residence. Police arrived within minutes of Normil, Brooks and Harris' return. One of the officers found the Corolla's keys in a trash can on the porch. Normil refused to give a statement to the police.

The jury found Brooks guilty on all counts. He filed a motion for judgment notwithstanding the verdict or a new trial, which was denied.

At the sentencing hearing convened on June 21, 2022, the trial court granted the State's motion to impose a mandatory extended term of imprisonment pursuant to N.J.S.A. 2C:44-3(d). The court imposed two

consecutive eighteen-year terms on the attempted murder convictions, subject to NERA; a consecutive fourteen-year term on the certain persons conviction with a seven-years period of parole ineligibility; and a concurrent ten-year term on the unlawful possession of a handgun conviction with a five-year period of parole ineligibility. The possession of a weapon for an unlawful purpose and conspiracy convictions were merged into the attempted murder convictions.

Brooks raises the following contentions in his counselled brief:

POINT I

THE SEARCH WARRANT AFFIDAVIT FOR THE SEARCH OF 427 MYRTLE AVENUE FAILED TO ESTABLISH PROBABLE CAUSE FOR THE SEARCH OF THAT RESIDENCE.

POINT II

DEFENDANT WAS PREJUDICED BY THE ADMISSION OF PHOTOGRAPHS OFFERED IN VIOLATION OF THE TRIAL COURT'S DISCOVERY ORDER.

POINT III

DETECTIVE RAYNOR'S IMPROPER NARRATION OF THE SURVEILLANCE VIDEOS AND STILL PHOTOGRAPHS TAKEN THEREFROM CONSTITUTED INADMISSIBLE LAY OPINION TESTIMONY WHICH DENIED DEFENDANT A FAIR TRIAL.

A-3805-21

POINT IV

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL.

POINT V

DEFENDANT WAS NOT SUBJECT TO THE MANDATORY EXTENDED TERM OF IMPRISONMENT IMPOSED, AND THE AGGREGATE SENTENCE OF 50 YEARS WITH 37.6 YEARS PAROLE INELIGIBILITY IS EXCESSIVE.

Brooks also raises the following contentions in his supplemental self-represented brief:

POINT I

THE DEFENDANT WAS DENIED HIS COMPULSORY PROCESS AND RIGHTS TO CONFRONTATION WHEN HE WAS DEPRIVED OF THE RIGHT TO PRODUCE QUAMERE SMITH IN HIS FAVOR; WHICH DENIED DEFENDANT THE OPPORTUNITY TO PRESENT A COMPLETE DEFENSE. THUS DEPRIVING DEFENDANT OF HIS RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY.

POINT II

THE STATE OPINING ON THE CREDIBILITY OF IT[]S WITNESSES WHILE IMPLYING THAT DEFENDANT['S] WITNESS[ES] W[]ERE UNTRUTHFUL WAS IMPROPER AND DEPRIVED DEFENDANT OF A FAIR TRIAL. THUS A NEW TRIAL [IS] WARRANTED.

9

SUBPOINT A

MULTIPLE FLAGRANT REMARKS ON BEHALF OF THE STATE DURING OPENING AND CLOSING ARGUMENTS DEPRIVED DEFENDANT OF A FAIR TRIAL BY AN IMPARTIAL JURY. THUS A NEW TRIAL IS WARRANTED.

SUBPOINT B

THE CUMULATIVE EFFECT OF THE PROSECUTOR[']S COMMENTS DEPRIVED DEFENDANT OF A FAIR TRIAL. THUS A NEW TRIAL IS WARRANTED.

II.

We first address Brooks' contention the court erred in denying his motion to suppress the evidence seized at the Myrtle Avenue home because the affidavit in support of the warrant failed to establish probable cause. Specifically, he argues the affidavit offered no evidence that he owned or resided at the house or that he had ever been inside the house.

The record shows MCPO Detective Ryan Mahony submitted an affidavit in support of a search warrant that was issued by a Law Division judge on August 2, 2019. The affidavit stated in pertinent part: surveillance video depicted a white Toyota Corolla sedan pulling alongside a Hyundai Tucson SUV and the Corolla driver, identified as Brooks, firing several shots into the Tucson;

10

police discovered the Corolla in the driveway behind the Myrtle Avenue residence; and Brooks and Marvine were seen on the porch of the house at that address. In her twenty-two-page written decision denying the motion to suppress the evidence seized at the residence, the judge stated:

> It is abundantly clear to this court that the affidavit could have and preferably should have included available facts and information that would have, according to the parties, provided an even stronger nexus to the criminal activity and individuals being investigated. Nevertheless, affording the warrant the substantial deference required under the law, this court finds that sufficient evidence existed within the four corners of the warrant affidavit upon which [the judge] could have reasonably relied in finding probable cause.

The judge also noted that although the affidavit did not state the time at which Brooks and Marvine were seen on the front porch in relation to the shooting "even assuming several hours had passed from the time of the shooting, such a delay is not fatal when taken in conjunction with the remaining facts within the affidavit." The judge found the presence of Brooks and the vehicle at the Myrtle Avenue residence "presented a sufficient nexus between the crime and the property itself." Thus, the judge concluded, the "facts and reasonable inferences to be drawn therefrom, when viewed in the totality of the circumstances, constituted sufficient information upon which [the judge issuing

11

the warrant] could have concluded that evidence of the shooting would be found at the residence."

The judge also commented the fact that the search was of a "third-party residence" was not relevant given that Brooks, the person believed to have been the shooter, was on the front porch of the residence and the vehicle seen in the video involved in the shooting was parked there as well.

We begin our own analysis by acknowledging the legal principles governing Brooks' challenge to the suppression motion. "Appellate courts reviewing a grant or denial of a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record." State v. Gamble, 218 N.J. 412, 424 (2014). Accordingly, appellate courts should reverse only when the trial court's determination is "so clearly mistaken 'that the interests of justice demand intervention and correction.'" Id. at 425 (quoting State v. Elders, 192 N.J. 224, 243 (2007)). However, a trial court's interpretation of the law is not entitled to any special deference. State v. Gandhi, 201 N.J. 161, 176 (2010).

A search executed pursuant to a warrant is accorded a presumption of validity. State v. Marshall, 199 N.J. 602, 612 (2009). Any doubt as to the validity of the warrant should ordinarily be resolved by sustaining the search.

State v. Jones, 179 N.J. 377, 388-89 (2004). Stated another way, unlike the situation where police conduct a warrantless search, the defendant bears the burden of proving there was no probable cause supporting the issuance of the warrant. Id. at 388. Probable cause for a search warrant exists when, given all the circumstances set forth in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." State v. Demeter, 124 N.J. 374, 380-81 (1991) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The probable cause determination must be made based on the information within the "four corners" of the supporting affidavit. Marshall, 199 N.J. at 611 (quoting Schneider v. Simonini, 163 N.J. 336, 363 (2000)).

The foundation of Brooks' challenge to the warrant affidavit rests on a faulty premise. It is true that in many cases, the probable cause to search a particular premises will be based on its relationship to a person believed to have committed the underlying crime. But there is no categorical requirement that a search warrant affidavit link the searched premises to the suspect. Rather, the crucial question is whether the affidavit establishes probable cause to believe that evidence of a crime will be found at a particular location. For example, relevant evidence of the crime might be stored at a location besides the suspect's

13

residence, especially when, as in this case, the State alleged conspiracy to commit the crime.

That said, defendant's reliance on State v. Boone, 232 N.J. 417 (2017), is misplaced. In Boone, the defendant moved to suppress drugs and a weapon found during the search of an apartment pursuant to a warrant. Id. at 421. The search warrant affidavit did not specify how the police knew that defendant, who was believed to be engaged in drug dealing, lived in the apartment in question. Ibid. The Court stressed no evidence was offered in the affidavit to show that the defendant lived in the apartment. Id. at 429. Importantly for purposes of the present appeal, nor were there any facts offered to "tie[]" the apartment "to the criminal activity alleged elsewhere in the affidavit." Ibid. Thus, the Court concluded, "[p]olice failed to provide the issuing judge a basis of knowledge from which to conclude that contraband would be found in the particular apartment." Ibid.

The matter before us is distinguishable. Here, the affidavit presented evidence connecting the Myrtle Avenue house to the criminal activity alleged in the affidavit. Specifically, Brooks and Marvine were seen on the front porch of the house shortly after the shooting. Furthermore, the white Corolla seen in the video of the shooting was parked at the house. Thus, applying the deferential

14

standard of review we accord to a Law Division judge's probable cause determination, we are satisfied the affidavit contained sufficient information to link the Myrtle Avenue house to the shooting notwithstanding the fact that there was no information to show that either Brooks or Marvine resided at that premises.

III.

We next address Brooks' contention that he was prejudiced by the late admission of photographs of an individual he claimed was the person driving the white Corolla at the time of the shooting. We conclude the trial court did not abuse its discretion in admitting the photographs. Nor has Brooks established that he was unduly prejudiced by their admission.

Brooks provided a notice of alibi on September 18, 2021, on the eve of trial. He claimed that he was with Normil and Harris at the time of the shooting. On September 23, 2021, the court issued an order giving the State until October 1 to provide discovery in response to the notice of alibi. Brooks thereafter supplemented his notice of alibi by claiming that an individual named Dennis Power was the shooter. The State subpoenaed photographs from the prison where Power had been incarcerated during the shooting and provided the photographs to the defense on October 14.

A-3805-21

Prior to the start of trial, Brooks moved to exclude the photos on the ground that the State violated the September 23 discovery order. In denying that motion, the trial court stated:

> This was a late notice of this defense. It's undeniable. In fact, it did come on the eve of trial . . . . It delayed the trial some period of time . . . . There was . . . a new scheduling . . . for the discovery in the alibi defense, but that was more for the purpose of moving this thing along, frankly. I will note that even the notice of the alibi defense did not initially conform with the Court Rules . . . . The State has sort of been scrambling because of the late notice of [the] alibi motion here.

Brooks then introduced the photos of Power into evidence during Normil's testimony. As addressed in the State's closing, the photos of Power showed that he had tattoos on his arms whereas the still photographs from the surveillance videos showed that the driver of the Corolla had no tattoos on his arms.

At his sentencing, Brooks moved for a new trial based again on the violation of the September 23 discovery order. In denying that motion, the court reasoned:

> [D]efendant is crying foul on a situation of his own making. While defendant indicates that the [c]ourt erroneously permitted these photos to be admitted into evidence, the [c]ourt did so in response to defendant's late filing of both an alibi and third party guilt[] defense. The State is entitled to investigate and discredit these defenses. . . .

16

. . . .

> . . . [P]ermitting the State additional time outside the order signed by [the judge] is well within this [c]ourt's discretion and permitted by Rule 3:12-2 . . . .

A trial court's resolution of a discovery dispute is entitled to substantial deference and is reviewed for abuse of discretion. State v. Stein, 225 N.J. 582, 593 (2016). The sanction of preclusion for a discovery violation is a "drastic remedy" that should be applied only after other alternatives are fully explored. State v. Washington, 453 N.J. Super. 164, 190 (App. Div. 2018) (quoting State v. Scher, 278 N.J. Super. 249, 272 (App. Div. 1994)).

It is beyond dispute that a defendant has a constitutional right to attempt to prove their innocence by proving the crime charged was committed by a third party. State v. Hannah, 248 N.J. 148, 180 (2021). But that right is not at issue here. Rather, defendant claims that he was somehow prejudiced by the late decision on the admissibility of the photographs. He does not specify, however, how he was so prejudiced. We note that "'[p]rejudice' in this context refers not to the impact of the testimony itself, but the aggrieved party's inability to contest the testimony because of late notice." State v. Heisler, 422 N.J. Super. 399, 415 (App. Div. 2011).

Furthermore, the prejudice hypothesized by Brooks is the result of his own late notice of alibi. "The purpose of a notice of alibi is 'to avoid surprise at trial by the sudden introduction of a factual claim [that] cannot be investigated unless the trial is recessed to that end." State v. Irving, 114 N.J. 427, 433 (1989) (alteration in original) (quoting State v. Garvin, 44 N.J. 268, 272-73 (1965)). Here, in response to the late notice, the State sought to obtain a photo of Power, who was imprisoned at the time, to address defendant's third-party-guilt defense. We see no abuse of discretion in the trial court's decision to admit the photos that refuted defendant's claim that Power was driving the Corolla at the time of the shooting.

IV.

Brooks next contends that Raynor made improper comments during his testimony regarding the video of the shooting scene. Defendant objected to testimony from Raynor that characterized the white Corolla as "the shooters' car." The trial court sustained the objection and ruled that Raynor could not narrate the video, but could instead respond to questions posed by the prosecutor. Defendant contends Raynor offered improper lay opinion in his interpretation of the videos and photographs that "unduly prejudiced [d]efendant and denied him a fair trial."

18

Once again, we begin our analysis by acknowledging the applicable legal principles that apply. A trial court's ruling on the admissibility and scope of narration testimony is subject to review for abuse of discretion. State v. Singh, 245 N.J. 1, 20 (2021). Under N.J.R.E. 701, testimony in the form of an opinion may be admitted if it "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue."

Recently—and after the present trial was concluded—our Supreme Court in State v. Watson, 254 N.J. 558 (2023), interpreted several rules of evidence, including N.J.R.E. 701, to assess whether and in what circumstances video narration evidence by a witness who did not observe the events shown in the video in real time is admissible. Id. at 599-600. The Court explained that the witness must have "carefully reviewed [the] video a sufficient number of times prior to trial." Id. at 601. Furthermore, the testimony must be "helpful to the jury" in understanding the video and aid them in determining a fact in issue. Ibid. Whether the narration evidence is helpful "turns on the facts of each case." Id. at 602.

However, the Court cautioned that "narration evidence by a witness who did not observe events depicted in the video in real time may not include

opinions about a video's content and may not comment on facts the parties reasonably dispute." Id. at 599. The Court explained, "[i]n other words, they can present objective, factual comments, but not subjective interpretations." Id. at 603. Thus, "a witness cannot testify that a video shows a certain act when the opposing party reasonably contends that it does not." Ibid.

The Court added there should not be "continuous commentary" during the video by an investigator whose knowledge is solely based on viewing the recording. Ibid. "To avoid running commentary, counsel must ask focused questions designed to elicit specific, helpful responses." Ibid. Furthermore, the witness "should not comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence." Id. at 604.

"Consistent with those principles," the Court explained, "an investigator who carefully reviewed a video in advance could draw attention to a distinctive shirt or a particular style of car that appear in different frames, which a jury might otherwise overlook." Ibid. Even before Watson was decided, it was already well-settled that a trial court's ruling on the admissibility and scope of narration testimony is subject to review for abuse of discretion. Singh, 245 N.J. at 20.

In this instance, Brooks contends the prosecutor improperly asked leading questions. He objected to some and not others. The trial court sustained the objections, telling the prosecutor to "watch the leading." The Supreme Court in Watson cautioned against the use of "open-ended questions," consistent with its general prohibition against "running commentary." 254 N.J. at 603, 607. The Watson Court had no occasion to address leading questions, which are essentially the opposite of open-ended questions.

Even so, the law is well-settled that leading questions on direct examination are generally improper. State v. R.Y., 242 N.J. 48, 72 (2020). In this instance, however, we are satisfied that none of the leading questions elicited prejudicial responses, only uncontested objective facts. Therefore, we are not persuaded the leading questions violated the limitations imposed in Watson.

Defendant also cites Raynor's reference to defendant by name when he testified that Neptune's surveillance system "captured the white Toyota Corolla G55KFE registered to Gary Brooks, Jr., also driving around the vicinity of Monroe and Ridge in the minutes before the shooting," and the "other videos depicted the white Toyota Corolla, G55KFE in Gary Brooks, Jr.'s name, driving

21

around the area in the minutes before the shooting." Counsel did not object to these portions of Raynor's testimony.

The Watson Court cautioned against the testifying witness saying, "that's the defendant." 254 N.J. at 604. We find further guidance in the companion case to Watson, State v. Allen, 254 N.J. 530 (2023). Allen involved a shooting incident that was captured by two surveillance videos. Ibid. After the videos were played during the victim's testimony, the State called the lead detective to testify—while the videos were being played to the jury—about how he found the shell casings and bullets. Id. at 539-40. The detective stated, "[t]hat's the defendant firing the handgun," "I can see the suspect is still running, but . . . turning to his left," and "[t]his is where the suspect has turned and discharged the first round." Id. at 540 (emphasis omitted). The Court held that these comments did not constitute "proper fact testimony or admissible lay opinion testimony." Id. at 549. However, it found the error to be harmless because the evidence of the defendant's guilt of attempted murder was "compelling." Id. at 549-52.

Unlike in Allen, Raynor did not say the driver was defendant; he merely stated that the vehicle was registered to defendant, a fact that defendant does not dispute. Clearly, evidence that Brooks was the registered owner of the vehicle

that the shots were fired from is admissible. The only question is whether such testimony was improper because it occurred while the video was being played. We believe the detective's reference to defendant by name as the video was being played was objectionable under the limitations imposed by Watson and Allen. It is conceivable, if not likely, that the jury would interpret Raynor's comment as an opinion as to who was driving the vehicle in the vicinity of the crime scene at the time of the shooting.

Importantly, however, defense counsel did not object, depriving the trial court of an opportunity to take curative action. It is long settled that failure to object to testimony permits an inference that any error in admitting the testimony was not prejudicial. See State v. Nelson, 173 N.J. 417, 471 (2002); State v. Frost, 158 N.J. 76, 84 (1999) (holding that "[t]he failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made"). That inference is amplified here because counsel objected to other questions and answers. In these circumstances, as in Allen, we deem Raynor's remarks do not rise to the level of plain error because there was other compelling evidence identifying Brooks.

We next address Brooks' remaining argument that Raynor violated Watson/Allen limitations on police lay opinions regarding what is shown in a

video played to the jury. Specifically, Brooks contends it was improper for Raynor to: (1) answer "[t]wo" in response to the prosecutor's question as to how many people were inside the Corolla; (2) answer whether there was anyone else in the vehicle other than the driver; and (3) answer whether he thought the Corolla was an important piece of evidence. Brooks also contends it was improper for Raynor to comment on what was depicted in a still photograph from the Asbury Park video, testifying "[t]his is the moment in the video we saw earlier where the white Toyota Corolla, G55KFE, pulls up driver door to driver door of the silver Tucson." Defendant objected only to Raynor's explanation about how he knew two people were in the vehicle.

The Court in Watson cautioned that witnesses should not offer "subjective interpretations" of video evidence. 254 N.J. at 603. We are satisfied that Raynor's statements regarding the number of occupants in the vehicle were "objective, factual comments," consistent with the example provided in Watson stating that an individual in the video "opened the door with his elbow" was permissible while stating that the individual did so "to avoid leaving fingerprints" was not. Ibid. We likewise conclude Raynor's testimony regarding the still photograph was permissible since it too was an objective factual comment.

We are more concerned with the question and answer as to whether the Corolla was an important piece of evidence. Even if the question were deemed to be rhetorical—of course the Corolla played a key role in the crime and ensuing investigation—we deem it inappropriate for a prosecutor to ask a detective if a particular piece of evidence is "important" to the State's case. That point should be made by a prosecutor in summation, not by asking a detective to offer their opinion while testifying. However, given the absence of an objection to the question and answer, we do not believe it constitutes plain error warranting reversal of Brooks' convictions.

V.

Defendant in his self-represented brief contends he was denied his rights of compulsory process and confrontation because his request to have Smith testify did not come to fruition. An accused in a criminal case has a constitutional right to present witnesses in their defense pursuant to the due process and compulsory process provisions of the state and federal constitutions. State v. Feaster, 184 N.J. 235, 250 (2005).

The trial court noted with respect to Smith that the "[d]efense is relying on the State to determine if they're calling him." The court acknowledged, however, that defendant had sought the court's assistance in getting Smith

25

transferred from state prison to testify by way of a subpoena and a writ. That effort was unsuccessful because Smith refused to come to the courthouse. The court explained, "because of the situation being what it is with the [p]andemic and our limited ability to get state prison inmates here, our hands are tied."

Brooks did not move for a mistrial after learning that Smith had refused to come to court. Nor did he seek the court's assistance in forcing him to do so, or request that the court instruct the jury on the matter. The record clearly shows that Smith's unavailability was not the result of any action or inaction on the part of the State. A defendant's due process rights are violated when there is substantial government interference with a defense witness's choice to testify. Feaster, 184 N.J. at 251. That did not occur here. We thus are unpersuaded by Brooks contention his compulsory process rights were violated.

VI.

We next address defendant's contention raised in his supplemental self-represented brief that the prosecutor committed misconduct in his opening and closing arguments. Specifically, defendant challenges the prosecutor's comment in summation that the State had an obligation to present only truthful testimony. Brooks further claims the prosecutor committed misconduct in his summation by arguing that defendants were "hunting" the victims and that the attack was

"personal," and by arguing, without expert testimony, that Perry would have had difficulty seeing the shooter after he had been shot in the face.

Aside from the prosecutor's closing argument, Brooks also challenges for the first time on appeal a remark in the prosecutor's opening statement that the police watched the surveillance video and observed defendants in the white Corolla. Brooks also argues that even if the prosecutor's improper comments individually do not warrant reversal, their cumulative effect was unduly prejudicial.

We begin with the prosecutor's problematic comment, which prompted an objection. In summation, the prosecutor stated:

> The State did not present Mr. Perry or Mr. Smith. As I told you earlier, we have an obligation to present testimony we know to be truthful. It's also not necessary to satisfy the elements of the case. What I mean to say is I don't need to hear from Mr. Perry and Mr. Smith in order to satisfy the charges.
>
> . . . .
>
> . . . Mr. Perry testified the way he testified. As to his motivations, it's unclear. . . .
>
> . . . We don't put . . . Perry on because we're responsible and we have an obligation to present witnesses we know are going to tell the truth.

A-3805-21

Upon conclusion of the summation, both defense counsel objected to that remark. The court agreed it was improper and proposed a curative instruction. Defendant expressed satisfaction with the instruction. The court then instructed the jury:

> [A]s I'm going to explain in my jury charge, closing arguments are not evidence, they are just that: argument. Evidence comes from the testimony that you have heard and the physical evidence that has been admitted. During closing, the State indicated that it did not call certain witnesses because the State has an obligation to present only truthful testimony. All attorneys, whether they be for the State or the defense, have an obligation to only present truthful testimony. The credibility of any witness is for you to determine, and for only you to determine.

A conviction will be reversed on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a fair trial." State v. Wakefield, 190 N.J. 397, 437 (2007) (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). This means that the prosecutor's conduct must have been "'clearly and unmistakenly improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Id. at 438 (quoting Papasavvas, 163 N.J. at 625). Even if the prosecutor's comments "could be termed questionable," a new trial is not

warranted unless the comments are "sufficiently severe" to show a clear potential for prejudice. Id. at 440.

The prosecutor's remark concerning the State's obligation to present only truthful witnesses was improper. By stating the State was obligated to only present witnesses who are truthful as the reason for not calling Perry or Smith to testify, the prosecutor implied not only that those individuals were untruthful but that the witnesses who were called by the State were truthful. That comment, viewed in context, was tantamount to vouching for the credibility of the State's witnesses, which is not permitted. See State v. Rivera, 437 N.J. Super. 434, 446 (App. Div. 2014); State v. Scherzer, 301 N.J. Super. 363, 445 (App. Div. 1997). The responsibility for determining the credibility of witnesses is solely within the jury's purview. State v. R.B., 183 N.J. 308, 328 (2005).

The critical issue here is whether the court's instruction sufficiently cured that impropriety. An effective curative instruction needs to be "firm, clear, and accomplished without delay." State v. Vallejo, 198 N.J. 122, 134-35 (2009). It must not add commentary that could cause confusion or dilute the instruction's effect. State v. Prall, 231 N.J. 567, 587 (2018). Since defense counsel agreed to the language of the instruction, defendant is required to show plain error, that is, error clearly capable of producing an unjust result. Cf. State v. Bragg, 295

N.J. Super. 459, 468 (App. Div. 1996) (holding defendants are required to establish plain error if they failed to object to the limiting instruction regarding the use of other-crime evidence).

Brooks does not specifically point to why the curative instruction was inadequate. Rather, he argues more broadly that the prosecutor's comments were too "devastating" to be overcome by a curative instruction. We disagree and conclude the curative instruction agreed to by both defense counsel was adequate and thus did not have the clear capacity to produce an unjust result.

Defendant also argues prosecutorial misconduct in summation because of the statement that defendants were "hunting" the victims and that the attack was "personal." That comment was a reasonable deduction from the evidence that the Corolla had made a "loop" to follow the victims' vehicle. We see no error, especially considering that prosecutors are afforded "considerable leeway" in closing arguments to make "reasonably related" assertions from the evidence. Frost, 158 N.J. at 82.

We likewise reject Brooks contention the prosecutor impermissibly offered expert opinion in his closing by stating that Perry could not have seen who the shooters were because "[j]ust the sheer force of being shot in the face drives your face [away from the shooter]." The prosecutor's argument that it

would have been difficult for Perry to see the shooter after he had been shot in the face was reasonably supported by the evidence and did not require expert testimony.

We next address Brooks' challenge to the prosecutor's comment in his opening statement that the police watched the surveillance video and observed defendants in the white Corolla. As it turned out, Raynor did not explicitly testify at trial that the two individuals in the video were defendants. However, the State's case rested on whether defendants were, in fact, the individuals depicted in the video.

Such comments in an opening statement are not inappropriate if the prosecutor intends to introduce evidence from which a reasonable inference can be drawn to support the assertion. See State v. Hipplewith, 33 N.J. 300, 309 (1960). We are satisfied the prosecutor's contention that defendants were the persons in the Corolla captured on surveillance video falls into that category of permissible opening comments. Accordingly, we find no error, much less plain error, in the prosecutor's opening statement.

Finally, defendant argues that even if none of the challenged remarks individually constitute reversible error, their cumulative effect warrants reversal. The cumulative effect of trial errors may warrant reversal when it

"casts doubt on the propriety of the jury verdict that was the product of that trial." State v. Jenewicz, 193 N.J. 440, 474 (2008). Reversal may be justified when the cumulative effect of a series of errors is harmful, even if each error itself is harmless. Id. at 473. "[T]he predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538.

Here, the only improper prosecutorial comment was addressed through a curative instruction. The other remarks Brooks challenges for the first time on appeal were not improper. See Frost, 158 N.J. at 84. We therefore reject Brooks' cumulative error contention with respect to prosecutorial misconduct.

## VII.

We next turn our attention to Brooks contention, raised in his counselled brief, the trial court erred in denying his motion for a new trial based on comments by court personnel overheard during a recess, and the failure to give an adverse inference charge regarding the State's failure to call Smith as a witness.

## A.

Defendant contends that two virtual observers of the trial allegedly heard two court clerks disparaged his claim of innocence. The conversation took place during a lunch break when the jury was not present.

The standard of review of a decision on a motion for a new trial is whether it clearly appears that there was a miscarriage of justice under the law. State v. Armour, 446 N.J. Super. 295, 305-06 (App. Div. 2016). A motion for a new trial is addressed to the trial court's discretion the exercise of which will not be disturbed lightly on appeal. State v. Henries, 306 N.J. Super. 512, 529 (App. Div. 1997).

The court rejected defendant's request for a new trial after finding the conversation did not disparage defendant's claim of innocence, and the jury in any event did not hear the conversation. The trial court's findings are supported by the record, and we see no abuse of discretion.

## B.

We are unpersuaded by Brooks' contention he was entitled to a new trial because the court failed to give an adverse inference charge regarding Smith's failure to testify. The determination of whether to give an adverse inference

charge is reviewed for abuse of discretion. State v. Dabas, 215 N.J. 114, 132 (2013).

A party's failure to produce a witness who would "serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." State v. Clawans, 38 N.J. 162, 170 (1962). However, for the inference to be drawn, it must appear that the individual "was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved." Id. at 171. The "failure to call a witness available to both parties . . . preclude[s] the raising of an inference against either." Ibid. Further, the inference is not proper if the individual is unavailable, or the testimony would be "cumulative, unimportant or inferior to what had already been utilized." Ibid.

In sum, in determining whether to give a Clawans charge, the trial court must set forth on the record its findings on the following issues:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue [;] and (4) that such

testimony appears to be superior to that already utilized in respect to the fact to be proven.

[State v. Hill, 199 N.J. 545, 561-62 (2009) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985)).]

In rejecting Brooks' motion for a new trial, the trial court reasoned:

Smith was not peculiarly within the power or control of the State. While the State could exert certain control, they [we]re not in an exclusive position to do so. In fact, the [c]ourt . . . arranged to have Perry writted to court to testify for defendants and attempted to do so for Smith. Smith refused to be transported from New Jersey State Prison to testify for the defense. This further emphasizes that he was not in . . . the power or control of the State. . . .

. . . [T]he State conced[ed] [Smith] was the victim in this case, but [he] advised the police he did not see anything because he was watching a rap video at the time. The State further advised they could not put him on the stand because that would be suborning perjury.

Finally . . . the State submits and the court[] agree[s] that [Smith's] testimony was not superior to the video surveillance played in this case. The superior evidence was the video which shows the time before, the time during, and the time after the shooting.

We affirm the trial court's ruling substantially for the reasons it set forth.

Smith was available to both parties. That the State may have had "control" over him because he was incarcerated did not mean that defendant was unable to call him as a witness.

Furthermore, Smith's statement to the police was that he did not see who did the shooting. Therefore, his testimony would not have offered relevant evidence as to who fired the shots. In addition, as the trial court noted, defendant attempted to call Smith to testify but he refused to leave prison to go to court. Therefore, as a practical matter, Smith was unavailable.

## VIII.

We need only briefly address Brooks' sentencing arguments. Brooks was sentenced to a mandatory extended term under N.J.S.A. 2C:44-3(d) as a "[s]econd offender with a firearm."[3] The statute applies when a defendant is

---

[3] Through a Rule 2:6-11(d) letter, defendant raised an Erlinger v. United States, 602 U.S. 821 (2024) argument. Recently, the United States Supreme Court in Erlinger held "the Fifth and Sixth Amendments generally guarantee a defendant the right to have a unanimous jury find beyond a reasonable doubt any fact that increases his exposure to punishment." Id. at 828. The Court further stated, "[v]irtually 'any fact' that 'increase[s] the prescribed range of penalties to which a criminal defendant is exposed' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea)." Id. at 834 (alteration in original) (quoting Apprendi v. New Jersey, 530 U.S. 466, 490 (2000)).

convicted of a certain enumerated offense and was previously convicted of one

of the offenses. The extended term provision applies to the following crimes:

N.J.S.A. 2C:11-3; N.J.S.A. 2C:11-4; N.J.S.A. 2C:12-1(b); N.J.S.A. 2C:13-1;

---

We concluded in State v. Carlton that pursuant to Erlinger, "a unanimous jury must find beyond a reasonable doubt that all . . . of the [N.J.S.A. 2C:44-3(a)] factual predicates are present, or the defendant must admit these predicates as part of a knowing and voluntary waiver of the right to a jury trial with respect to extended-term eligibility." ___ N.J. Super. ___, ___ (App. Div. 2024) (slip op. at 22-23). We further concluded in Carlton that the application of Erlinger's holding to the persistent offender statute, N.J.S.A. 2C:44-3(a), applies retroactively to pipeline cases. Id. at ___ (slip op. at 20); see also Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (holding that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past").

We therefore afforded Erlinger's holding pipeline retroactivity to Erlinger's direct appeal of his sentence. We reversed Carlton's extended term sentence and remanded for resentencing consistent with Erlinger. Carlton, ___ N.J. Super. at ___ (slip op. at 66). We added that if the State seeks to impose an extended term sentence on remand, the trial court must hold a jury trial limited to the question of whether defendant is a persistent offender. Ibid. See N.J.S.A. 2C:44-3(a). The State shall have the burden of proving, beyond a reasonable doubt, the required persistent offender elements. Carlton, ___ N.J. Super. at ___ (slip op. at 65).

Here, however, we need not address the Erlinger ruling because the State has conceded that the extended term must be vacated. Moreover, the second-offender-with-a-firearm extended term, unlike the persistent-offender extended term at issue in Carlton, does not involve a separate occasions inquiry or consideration of the defendant's age at the time of conviction.

N.J.S.A. 2C:14-2(a); N.J.S.A. 2C:14-3(a); N.J.S.A. 2C:15-1; N.J.S.A. 2C:18-2; N.J.S.A. 2C:18-2.1; N.J.S.A. 2C:29-5; and N.J.S.A. 2C:39-4(a).

Here, defendant had been previously convicted of N.J.S.A. 2C:39-7(b)(1) (certain persons not to have weapons or ammunition). That offense is not included in the list of predicate crimes under N.J.S.A. 2C:44-3(d), in distinction to the offense codified in N.J.S.A. 2C:39-4 which proscribes possession of a firearm for an unlawful purpose. The State now concedes defendant was not eligible for the second-offender-with-a-firearm extended term of imprisonment. Because the sentence was not authorized by statute, it is illegal. State v. Schubert, 212 N.J. 295, 308-09 (2012).

The State concedes the matter must be remanded for resentencing. Because the sentencing error so significantly influenced defendant's penal exposure, we need not address his contentions that the sentence imposed was excessive, the trial court misapplied the relevant aggravating and mitigating factors, and the trial court erred in imposing consecutive sentences on the attempted murder convictions principally on the grounds there were two victims. See State v. Liepe, 239 N.J. 359, 377 (2019) (holding that injuries inflicted on multiple victims warranted consecutive sentences); State v. Carey, 168 N.J. 413,

429-30 (2001) (noting that consecutive terms should ordinarily be imposed where there are multiple victims).

We note that in State v. Torres, the Court stressed that a trial court imposing consecutive sentences must consider the "fairness of the overall sentence." 246 N.J. 246, 267-68 (2021). Because the overall sentence may change significantly on remand sans the extended term of imprisonment that was originally imposed, the court on remand should consider anew all relevant factors and circumstances. We instruct the parties to provide the remand court with their appeal briefs so that the court will be alerted to their contentions with regard to the calculus of aggravating and mitigating factors and on whether to impose consecutive sentences.

To the extent we have not addressed them, any remaining contentions raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

In sum, we affirm defendant's convictions and remand for resentencing. We do not retain jurisdiction.

Affirmed in part and reversed and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION